# IN RE: TUTU WELLS CONTAMINATION LITIGATION

Master Docket File No. 1989-107

RHODA J. HARTHMAN, CHARLOTTE A. LA BARRE, ALBERT E. HARTHMAN, ARTHUR E. HARTHMAN, AUSTIN E. HARTHMAN, EDGAR A. HARTHMAN, SAMMY E. HARTHMAN and P.I.D, INC. WATER SERVICES LIMITED, and TUTU SERVICES, LIMITED, **Plaintiffs**

**v.**

TEXACO, INC., TEXACO CARIBBEAN, INC. VERNON MORGAN, ESSO STANDARD OIL, S.A., LTD., DANIEL BAYARD, EXXON CORPORATION, ESSO VIRGIN ISLANDS, INC., ESSO STANDARD OIL COMPANY (PUERTO RICO), THE DUPLAN CORPORATION, LAGA INDUSTRIES, LTD. PANEX CO., PAUL LAZARE and ANDREAS GAL, **Defendants**

ESSO STANDARD OIL, S.A., LTD., TEXACO CARIBBEAN, INC., VERNON MORGAN, **Third-Party Plaintiffs**

**v.**

LAGA INDUSTRIES, LTD., DUPLAN CORPORATION, PANEX COMPANY, PAUL LAZARE and ANDREAS GAL, L'HENRI, INC., RAMSAY MOTORS, INC., **Third Party Defendants**

Civil No. 89-220

**FOUR WINDS PARTNERSHIP, Plaintiff**

**v.**

TEXACO CARIBBEAN, INC., VERNON MORGAN, ESSO STANDARD OIL, S.A., LTD., DANIEL BAYARD, EXXON CORPORATION, ESSO VIRGIN ISLANDS, INC., THE DUPLAN CORPORATION, LAGA INDUSTRIES, LTD., PANEX INDUSTRIES, INC., PANEX CO., PAUL LAZARE, and ANDREAS GAL, **Defendants**

41

**ESSO STANDARD OIL, S.A., LTD., Counter-claimant and Third-Party Plaintiff**

v.

**LAGA INDUSTRIES, LTD., DUPLAN CORPORATION, PANEX COMPANY, PAUL LAZARE and ANDREAS GAL, L'HENRI, INC., RAMSAY MOTORS, INC., Third-Party Defendants**

Civil No. 89-224

District Court of the Virgin Islands

Div. of St. Thomas and St. John

August 13, 1993

RICHARD R. KNOEPFEL, ESQ. (BRIGGS, KNOEPFEL & RONCA), Charlotte Amalie, St. Thomas, V.I., and THOMAS H. HART, III, ESQ. (ALKON, RHEA & HART), Christiansted, St. Croix, V.I., *for PID-Harthmans*

JOHN K. DEMA, ESQ., CAREY-ANNE MOODY, ESQ. (LAW OFFICES OF JOHN K. DEMA, P.C.), Christiansted, St. Croix, V.I., and DARREN DEFOE, ESQ., Waterford, Maine, *for Four Winds Plaza Partnership*

ADDISON J. MEYERS, ESQ., MARY HOERBER, ESQ. (LAW OFFICES OF O'CONNOR & LEMOS), Coral Gables, Florida and EDGAR CHRISTENSEN, ESQ. (LAW OFFICES OF R. ERIC MOORE), Christiansted, St. Croix, V.I., *for Texaco, Inc., Texaco Caribbean, Inc.*

ROBERT T. LEHMAN, ESQ., DEBRA ROSEN, ESQ., WILLIAM J. O'KANE, ESQ., CHRISTOPHER GIBSON, ESQ. (ARCHER & GREINER), Haddonfield, New Jersey, and DOUGLAS L. CAPDEVILLE, ESQ., Christiansted, St. Croix, V.I., *for Esso Standard Oil, S.A., Ltd., Esso Virgin Islands, Inc., Esso Standard Oil Company (Puerto Rico)*

RICHARD E. DALEY, ESQ. (LAW OFFICES OF PATTIE & DALEY), Christiansted, St. Croix, V.I., and E. BARCLAY CALE, JR., Co-Counsel, THOMAS A. DYE, ESQ. (MORGAN, LEWIS & BOCKIUS), Miami, Florida, *for Exxon Corporation*

JOHN A. ZEBEDEE, ESQ. (LAW OFFICES OF JAMES L. HYMES), Charlotte Amalie, St. Thomas, V.I., *for Vernon Morgan*

FRANCIS E. JACKSON, JR., ESQ., Charlotte Amalie, St. Thomas, V.I., *for Daniel Bayard*

CAROL ANN RICH, ESQ. (CAMPBELL, ARELLANO & RICH), Charlotte Amalie, St. Thomas, V.I., *for Ramsay Motors, Inc.*

NANCY D'ANNA, ESQ., Cruz Bay, St. John, V.I., and PATRICIO MARTINEZ LORENZO, ESQ., Hato Rey, Puerto Rico, for *L'Henri, Inc.*

RICHARD G. LELAND, ESQ., Co-Counsel, DAVID SLOSSBERG, ESQ. (LAW OFFICES OF ROSENMAN & COLIN), New York, New York and KEVIN A. RAMES, ESQ., Christiansted, St. Croix, V.I., *for Paul Lazare, Andreas Gal, The Duplan Corporation, Laga Industries, Ltd., Panex Industries, Inc., and Panex Co.*

JOHN R. COON, ESQ., Gallows Bay, St. Croix, V.I., *for Western Auto Supply Company*

RALDA V. SIMMONDS, ESQ., Charlotte Amalie, St. Thomas, V.I., *for Virgin Islands Housing Authority*

GEORGE MARSHALL MILLER, ESQ., Charlotte Amalie, St. Thomas, V.I., *for Thomas A. Gassett G.S. Industries, Inc.*

ROSALIE SIMMONDS BALLANTINE, ESQ., Attorney General for the Virgin Islands, HENRY THOMAS, Assistant Attorney General, Charlotte Amalie, St. Thomas, V.I., *for V.I. Department of Education*

KATHERINE E. HARSCH, ESQ. (BORNN, BORNN, HANDY & RASHID), Charlotte Amalie, St. Thomas, V.I., *for Siegfried Torinus and Waltrad Torinus*

BROTMAN, *Judge (Sitting by Designation)*:

Because of the large number of litigants and the numerous motions pending in this case, the Court will set forth in some detail the case's factual background and procedural history in order to place in perspective the parties' positions.

## INTRODUCTION

## I. FACTUAL BACKGROUND

These actions arose when, on July 8, 1987, a Mr. Eric Tillet detected odors of gasoline emanating from a well located on No. 186 Estate Anna's Retreat, Tutu, St. Thomas. Tillet contacted the Department of Planning and Natural Resources of the Territory of the Virgin Islands ["DPNR"], which contacted and conferred with the United States Environmental Protection Agency ["EPA"].

On or about August 7, 1987, the DPNR ordered the closure of the wells of the Four Winds Plaza Partnership located at No. 392 Estate Anna's Retreat and of the wells of PID, Inc. and members of the Harthman family. See EPA Administrative Order of Consent, Index

No. 11-RCRA-Proceeding 7003 & 9003-92-0401, dated February 19, 1992 ¶ 6 [hereinafter Consent Order]; see also PID Compl. ¶¶ 15–16; Four Winds Compl. ¶¶ 13–14. As a result of the DPNR Orders, eighteen wells were closed between July 31 and September 2, 1987, and they remain closed to date.

By late July 1987, the EPA had begun its investigation of the suspected pollution of the Tutu Water Wells under the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601–9615 ["CERCLA"] and the Resource Conservation and Recovery Act, 48 U.S.C. § 6991 et seq. ["RCRA"]. On August 10 and 11, 1987, the EPA collected water samples from twenty-four wells located in the Tutu section of Anna's Retreat within the Turpentine Run Aquifer. An analysis of the samples revealed the presence of 1, 2-Trans-Dichloroethylene ["DCE"], Trichloroethylene ["TCE"], Tetrachloroethylene ["PCE"], Toluene ["TOL"], benzene, and Terbutylmethylether ["TBME"]. In October 1987, the EPA collected additional samples from twenty-four wells. The analysis of these samples revealed that DCE, TCE, PCE, and TBME are the major contaminants of the water. See Consent Order ¶ 11. In January 1988, after taking additional samples from 123 cisterns serviced by water haulers in the area, EPA initiated a limited CERCLA Removal Action, which included cleaning some cisterns, providing a temporary alternative water supply, and monitoring the well water. See id. ¶¶ 8–12. A photovac sampling in 1989 showed high levels of benzene, TCE, and PCE. See id. ¶ 13. Benzene, DCE, PCE, TCE, TOL, and TBME are gasoline additives, petroleum derivatives, or components of cleaning solvents used by service stations. PCE is also a common component of dry cleaning fluids.

In 1987 and 1988, the EPA issued a series of unilateral orders to Esso Standard Oil, S.A. ["ESSOSA"]; Daniel Bayard; Texaco, Inc., Texaco Caribbean, Inc., and Vernon Morgan ["Texaco Defendants"]; and L'Henri Dry Cleaners ["L'Henri"], requiring them to supply information about the underground storage tanks in which they kept their gasoline and about their use or handling of PCE. The orders also required them to conduct soil vapor surveys. See id. ¶¶ 14–33. The surveys confirmed the presence of TCE, PCE, DCE, and benzene at the Esso facility and at the Four Winds Parking Lot. See id. ¶¶ 20–22. Texaco submitted information confirming that gasoline had leaked from its underground storage tanks. See

47

id. ¶¶ 25–26. Soil samples at the L'Henri facility contained PCE in concentrations of 440 parts per million. See id. ¶ 33.

In March 1989, the EPA completed preliminary assessments of potentially responsible parties ["PRP's"] in the area. The parties included Ramsay Motors, Inc.; the old LAGA clothing manufacturing facility, which is now occupied by the Virgin Islands Department of Education ["VIDE"]; and others. Pursuant to the provisions of RCRA and CERCLA, the EPA on March 22, 1990 issued an unilateral Consent Order against ESSOSA, Texaco, and L'Henri, requiring them to take over the well monitoring program. See id. ¶ 4; EPA Administrative Order, Index No. 11-CERCLA-00401, RCRA-90-UST-9003-0401, dated March 22, 1990, Section VII, at 11–13 [hereinafter Unilateral Order).

A. *The Original Complaints*

The first complaint in this action was filed on July 6, 1989 by Plaintiff PID, Inc. against the Texaco Defendants, ESSOSA, and Bayard.[1] Four Winds filed an action, District Court Civil No. 1989-224, against the same Defendants on July 7, 1989. The cases were consolidated on November 8, 1989. On June 20, 1990, PID amended its complaint to add seven members of the Harthman family as additional Plaintiffs.

PID, the Harthmans, and Four Winds have all alleged similar common law tort claims for negligence, trespass, nuisance, and strict liability against the Defendants. All the claims arise out of DPNR's closure of the commercial and private wells which draw water from the underground water system known as the Turpentine Run Aquifer ["Tutu Water Wells"]. See Complaints dated July 6, 1989 and June 20, 1990, PID v. Texaco, No. 89-220; Complaint dated July 7, 1989, Four Winds v. Texaco, No. 89-224. Plaintiffs allege that the aquifer that supplied the Tutu Water Wells is the source of potable water to some 20,000 residents. Plaintiffs seek compensatory and punitive damages for lost profits and lost business opportunities allegedly caused by their inability to use or sell the water formerly produced by the wells.

---

[1] The first complaint to arise out of the contamination of the Tutu Water Wells was filed on April 20, 1989 by Total Vision, Inc. d/b/a Tillets Water Delivery, Inc.; Jim Tillet & Caribbean Inc.; and Eric, Boris, James and Rhoda Tillet against the same Defendants. The Tillet case was settled and dismissed with prejudice on January 11, 1991.

B. *Amended complaints, Third and Fourth Party Complaints, and Counterclaims*

In March 1992, the PID/Harthmans Plaintiffs moved for permission to file the Fourth Amended Complaints, and Four Winds moved to file its First Amended Complaint. The Amended Complaints assert direct claims for negligence, trespass, strict liability, and nuisance against LAGA Industries, Ltd., Duplan Corp., Panex Co., Paul Lazare, and Andreas Gal ["LAGA Defendants"]. Plaintiffs also added ESSOVI, Esso Standard Oil Co. (Puerto Rico) ["ESSORICO"] [together with ESSOSA, hereinafter "Esso Defendants"] and EXXON Corp. as additional defendants. They assert claims against these Defendants on the theory that they shared responsibility and/or were legally affiliated with, or exercised control over, ESSOSA. Plaintiffs did not assert any direct claims against Ramsay or L'Henri. Four Winds also added a claim for alleged CERCLA response costs in its March 2, 1992 Complaint. PID has made no such claim. In its Second Amended Complaint, filed March 1, 1993, Four Winds added ESSORICO and Western Auto supply Co. ["Western Auto"] as defendants.

On or about March 2, 1992, ESSOSA filed motions for leave to bring third party complaints against Ramsay and L'Henri and against the LAGA Defendants, seeking: (1) common law contribution in the event that Esso is liable to Plaintiffs, (2) recovery of response costs under CERCLA and RCRA, and (3) recovery of response costs under the common law of negligence.

In June 1992, Esso asserted a counterclaim against Four Winds seeking: (1) contribution should Esso be liable to PID; (2) recovery of response costs under CERCLA and RCRA, and (3) recovery of response costs under the common law of negligence. The counterclaims allege that Four Winds contributed to the pollution of the Tutu Water Wells by applying GAF roofing material to the catchment area of its shopping center. In June 1992, L'Henri asserted cross-claims for damages and response costs against Esso, Ramsay, and the LAGA Defendants, and in August 1992, L'Henri asserted similar cross-claims against Bayard and the Texaco Defendants.

At a meeting of all counsel for the parties joined as of July 1992, it was agreed that the newly joined parties would have until January 15, 1993 to assert any additional claims they might have against new parties. A Third Amended Case Management Order ["CMO"] reflecting this agreement was circulated among counsel. It ex-

tended to February 28, 1993 the period within which new parties and claims could be added.

On October 19, 1992, the court held a pre-trial hearing to consider all pending motions in this matter. Counsel for the parties presented arguments on their motions, and the court took the matter under advisement. During this period, discovery became snarled, and a barrage of motions to compel and for production were filed by and against parties on both sides of this litigation. In addition, the parties added prayers for An Order of Contempt, Dismissal and Sanctions. The court will address these motions in a supplemental memorandum.

On March 12, 1993, the court entered an order giving the parties until February 28, 1993 to file amended, third party, and fourth party complaints.[2] Defendants ESSOSA and ESSOVI filed additional Third-Party Complaints against Western Auto Supply, the Virgin Islands Housing Authority ["VIHA"], the Virgin Islands Department of Education [hereinafter "VIDE"], Francois Realty Corp., Siegfried Torinus, Waltrad Torinus, Thomas Gassett, G.S. Industries, Inc., and TAG Industries, Inc. Ramsay filed complaints against the VIHA, VIDE, Siegfried Torinus, Waltrad Torinus, Thomas Gassett, G.S. Industries, Inc., and Tag Industries, Inc. L'Henri filed complaints against VIHA, Western Auto Supply, Thomas Gassett, G.S. Industries, TAG Industries, Rodriguez Esso, and VIDE. These Third-Party Complaints all asserted claims for contribution and indemnity under the common law, and for contribution and response costs under CERCLA. L'Henri and Ramsay have moved to sever the Third and Fourth Party Complaints. Severance has been opposed. The Court will address these motions in a supplemental opinion.

Plaintiffs and Defendants have been engaged in intense pre-trial discovery and motion practice for over four years. During this period, thousands of documents have been produced and exchanged,

---

[2] On March 12, 1993 the court entered an Order approving the Third Amended CMO, and granted leave to amend complaints and add new parties. It was later called to the court's attention that February 28, 1993 falls on a Sunday. Under both the Local Rules of Civil Procedure, Rule 6, and Fed. R. Civ. P., Rule 6, the date for filing any papers within the time specified by this Order would be extended automatically to March 1, 1993. Therefore, any papers subject to the Court's March 12, 1993 Order, filed on March 1, 1993, are timely to the extent that all motions to (file) and amend complaints to add parties (and claims) filed on or before March 1, 1993 shall be deemed granted.

and over one hundred depositions have been taken. This matter, which began as an environmental tort case between Plaintiffs and Defendants, has grown into a complex, multi-layered litigation with Third and Fourth Amended Complaints, counterclaims, cross-claims, third party claims, and fourth-party claims. Over two dozen parties, and an equally large number of counsel, are now involved. Control and management of this litigation has been lacking, largely because of the long judicial vacancies in both districts of the Territory. However, the court pauses to express its appreciation to the litigants who, though engaged in vigorous and at times acrimonious advocacy, have nevertheless worked together in recent months to assist the court in readying these cases for trial.

In this memorandum opinion, the court will address the following motions, not necessarily in the order in which they are listed:

1. ESSOSA and ESSOVI's motion for partial summary judgment to dismiss Counts II and VI of Four Winds' First Amended Complaint.

2. ESSOVI's motion to dismiss Counts I, V, and VI of Four Winds' First Amended Complaint.

3. ESSOSA and ESSOVI's motion for partial summary judgment to dismiss Count IV of PID/Harthmans' Fourth Amended Complaint.

4. EXXON's motion to dismiss Four Winds' First Amended Complaint.

5. EXXON's motion to dismiss PID/Harthmans' Fourth Amended Complaint.

6. EXXON's Motion to Strike or for Clarification of Order Granting Leave to Four Winds to Add Claims Against EXXON.

7. EXXON's Motion to Strike or for Clarification of Order Granting Leave to PID/Harthmans to Amend to Add Claims Against EXXON.

8. ESSORICO's Motion to Dismiss Four Winds' Second Amended Complaint.

9. Texaco, Inc. and Texaco Caribbean, Inc.'s Motion to Dismiss PID/Harthmans' Claim Against the Texaco Defendants.

10. Texaco, Inc. and Texaco Caribbean, Inc.'s Motion to Dismiss L'Henri, Inc.'s Third-Party Claim Against the Texaco Defendants.

11. Laga Defendants' Motion to Dismiss the Amended Complaint.

The court will address the following motions in a supplemental opinion:

1. L'Henri's Motion for Severance and Separate Trials.

2. L'Henri's Motion for Summary Judgment. (Withdrawn by L'Henri and later reinstated by Ramsay.)

3. Ramsay's Motion for Severance and a Separate Trial of All Third and Fourth Party Claims for Contribution, Indemnity, and Response Costs.

4. Ramsay's Motion to Continue Consideration of L'Henri's Motion for Summary Judgment.

## DISCUSSION

Several of the motions before the court are brought pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss for failure to state claims upon which relief may be granted. The standard for dismissal under Rule 12(b)(6) is legal insufficiency of the pleadings; that is, the motion must be granted if the allegations of the complaint, accepted as true and independent of any other evidence, fail to make out the elements of a claim. The complaint must be liberally construed in conformity with the mandate of Fed. R. Civ. P. 8(f), which calls only for a short and plain statement of a claim showing that the pleader is entitled to relief. See 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 463 (1990). Only "if as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations'" must the claims be dismissed. Neitzke v. Williams 490 U.S. 319, 327, 109 S. Ct. 1827, 1832, 104 L.Ed. 2d 338 (1989) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L.Ed. 2d 59 (1984)).

In addition, Rule 12(b) provides that "if matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment," and the court must give all parties the opportunity to present all relevant evidence in support of or in opposition to the motion. The court will address the motions in accordance with the above.

## II. APPLICABLE STATUTE OF LIMITATIONS

Because the determination of the statute of limitations issue will moot several of the issues raised in the competing motions, the court will address this question first. As stated earlier, on March 3, 1992 PID/Harthmans filed a Fourth Amended Complaint. The Fourth Amended Complaint adds a claim based on strict liability and asserts claims against EXXON, ESSORICO, and the LAGA Defendants. On or about March 2, 1992, Four Winds filed its First Amended Complaint, which asserts claims against EXXON, ESSOVI, and the LAGA Defendants. In addition, Four Winds adds claims under the Solid and Hazardous Waste Management Act, Virgin Islands Code Ann. tit. 19, §§ 1551–1554, and the Water Pollution Control Act, Id. tit. 12, §§ 181–198, and a claim under CERCLA for contribution and clean-up costs. EXXON moves to dismiss both amended complaints, arguing, among other things, that the applicable statute of limitations is two years and that by March 1992, the two-year period had expired.

ESSOVI and ESSORICO move to dismiss the amended complaints, also arguing that the new claims are time-barred because the applicable limitation period is two years. The LAGA Defendants move to dismiss the amended complaints, too, arguing that the claims are time-barred not only because the applicable statutory period is two years, but also because the claims are against entities who no longer have the capacity to be sued.

All Defendants advance the argument that because the claims sound in tort, a two-year statute of limitations applies. Defendants contend that this two-year period expired in July, 1989 and therefore that the claims asserted in PID/Harthmans' Fourth Amended Complaint and Four Winds' First and Second Amended Complaints are time-barred.

Plaintiffs oppose these motions on several grounds. First, both PID/Harthmans and Four Winds argue that the six-year statute of limitations applies because the complaints state claims for tortious injury to land or a property interest. As such, they argue, the amended complaints were filed well within the statutory limitation period. Second, Plaintiffs argue that even if the court were to agree with Defendants that the limitation period is only two years, under the discovery rule, the claims against EXXON did not accrue until 1991, when Plaintiffs were able to identify the pervasive role played by EXXON in the overall operations of ESSOSA, ESSORICO

and ESSOVI and to untangle the corporate structure of the ESSO Defendants. Indeed, PID/Harthmans contend that the cause of action against these Defendants did not accrue until February 13, 1992, when they were able conclusively to confirm these Defendants' roles in controlling the maintenance, replacement, and upgrading of underground storage tanks in St. Thomas.

A. *The Limitations Provisions*

Before the court can determine whether the actions are time-barred, it must first decide the question of which statutory period—two years or six years—applies to Plaintiffs' claims alleging tortious injury to property. Section 31(5)(A) of Title 5 of the Virgin Islands Code Annotated provides that actions for "libel, slander, assault, battery, seduction, false imprisonment, or for any injury to person or rights of another not arising on contract and not herein especially enumerated" are subject to a limitation period of two years. Subsection (3)(C) of section 31 provides that "[a]n action for waste or trespass on real property" is subject to a limitation period of six years, and subsection (3)(D) provides that "[a]n action for taking, detaining, or injuring personal property, including an action for the specific recovery thereof" is also subject to a limitation period of six years.

In their complaints, Plaintiffs state claims for injury to property or property interests—namely, the contamination of their private and commercial water wells—and for interference with the beneficial use of the water. Plaintiffs broadly state that they are the owners or lessees of land in the Tutu area and that they owned and/or operated water wells which were fed by the Tutu Turpentine Aquifer. In order to capture water from the aquifer for their commercial and private use, each Plaintiff was required under Virgin Islands law to obtain a permit or a license. See Virgin Islands Code Ann. tit. 12, §§ 151–167. Plaintiffs allege that Defendants negligently caused the discharge of petroleum products and other pollutants, which resulted in the contamination of the Turpentine Run Aquifer and the Tutu Water Wells.

Defendants move to dismiss Plaintiffs' Claims for negligence, nuisance, and strict liability. Defendants contend that these claims are barred by the two-year statute of limitations. They argue that the statute of limitations governing actions for property damage does not apply. One group of Defendants argues that the six-year

limitation period does not apply because "there is no real property right at issue." See Transcript of October 19, 1992 hearing, Romero for Esso Defendants at 68 [hereinafter "October 19 Hearing"]. EXXON argues that "because water in its natural state is a part of the land in or upon which it is found . . . it is therefore real property and not personal property." EXXON's Reply Br. to Four Winds' Resp. to EXXON's Mot. to Dismiss at 7. EXXON argues that the six-year statute of limitations does not apply to Plaintiffs' claims because section 31(3)(D) "applies to injury to personal property," and nowhere in the First Amended Complaint does Plaintiff allege that Defendants damaged Plaintiffs' personal property. In support of their argument, Defendants make much of how Plaintiffs chose to label their claims.

### 1. *Real or Personal Property*

■ First, the court notes that Fed. R. Civ. P. 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Consequently, how Plaintiffs labelled their claims does not alter or control the nature of the claims. The claims stated in the complaint, whether labelled, mislabelled, or un-labelled, manifestly state claims for damage to real property. The claims allege that Defendants negligently contaminated the water wells on Plaintiffs' real property; and the water wells are a part of Plaintiffs' real property. Under Virgin Islands law, an "estate [or] interest in land" includes "every interest . . . legal and equitable, present and future, vested and contingent." Virgin Islands Code Ann. tit. 28, § 1. In addition, at common law "real property" or "interest in land" includes "the surface of the earth, and things of a permanent nature attached thereto, improvements of a permanent character placed on it, the space above the earth, and minerals, oils and gases found below the surface of the earth." 73 C.J.S. Property § 16, at 187–188 (collecting cases).

Furthermore, where, as here, no precedents relate specifically to the adjudication of a Virgin Islands dispute, the courts are directed to turn to the Restatement of the Law as approved by the American Law Institute for the applicable rule of law. See Virgin Islands Code Ann. tit. 1, § 4; Co-Build Cos., Inc. v. Virgin Islands Refinery Corp., 570 F.2d 492 (3d Cir. 1978). Chapter 21 of the Restatement (Second) of Torts, which is entitled "Interference With Use of Water," states that "[t]he right to use water is an interest in real property, whether

it is held by a riparian proprietor on a watercourse of lake, by a non-riparian with a special right or by a possessor of land overlying ground water or underlying surface water." Restatement (Second) of Torts § 849, Cmt. a. Comment a goes on to provide that "the holder of the right is entitled to protection of his use of water from any type of tortious conduct that may be directed at an interest in real property." The Restatement also recognizes other "special types of water rights" which are "created by statute, charter, permit or license by the state. These special rights, which are severable from the interest in land and the exercise of which is personal to the licensee, do not change the nature of the property interest from real to personal." Id. Thus, as the Restatement makes clear, Plaintiffs' water wells are real property.

### 2. *Two-Year Statutory Period Governs Property Tort Claims*

Because Plaintiffs' water wells are real property, it is clear that section 31(3)(D), which governs injury to personal property, does not apply to Plaintiffs' claims. The court agrees with the Esso Defendants that the court cannot disregard the plain language of the statutory provision to avoid this conclusion. The relevant clause of section 31(3)(D) refers to "injury to personal property." The parties have not cited and the court has not found any case interpreting Virgin Islands law applying section 31(3)(D) to actions for tortious injury to real property.[3]

---

[3] Four Winds argues that the case of McKibben v. Mohawk Oil Co., 667 P.2d 1223 (Alaska 1983), provides persuasive authority for its position that because the injury is to land, the applicable limitation period is six years. The Virgin Islands statute of limitations is patterned on Alaska's statute of limitations. McKibben was an action involving tortious injury to land. The claims were non-trespassory and did not involve "waste to real property." The McKibben court, construing language identical to that of section 31(3)(D), held that because the claims arose out of injury to land, they are governed by Alaska's six-year statute of limitations, which deals with injury to real property. Plaintiff urges the court to adopt this construction, contending that in the Virgin Islands the interpretation of a statute is controlled by the views of the courts from which the statute was derived at the time the statute was adopted in the Virgin Islands.

Decided as it was in 1983, more than twenty years after the statute was adopted in the Virgin Islands, McKibben is not controlling. Moreover, McKibben offers little guidance; there the court summarily concluded, without discussion of the statutory language or the nature of the claims, that the claims were within the six-year limitation period.

■ The court concludes that Plaintiffs' claims are subject to the two-year limitation period set forth in section 31(5)(A). Unlike other jurisdictions, the Virgin Islands' legislature has declined to provide a special limitation period for actions for tortious injury to land. Moreover, the court's conclusion is supported by the Restatement (Second) of Torts. The Restatement states that tortfeasors which injure another's use of water by engaging in activities that do not involve the use of water are subject to liability under the "rules stated in §§ 281–499 relating to negligent conduct, in §§ 500–503 relating to reckless conduct, or in §§ 519–524A relating to abnormally dangerous conduct." Nothing in these sections suggests that a special, longer limitation period ought to apply to actions for tortious injury to land. As a result, Plaintiffs' negligence, nuisance, and strict liability claims are subject to the two-year limitation period set forth in section 31(5)(A).

## B. *Rules Governing Accrual Date of Claims*

In order to determine whether Plaintiffs' claims are time-barred, the court must determine when the claims accrued. Because the injury Plaintiffs allege stems from the seepage of contaminants into their wells, the actual date of injury is impossible to fix. The most that may be said is that the injury was discovered on or about July 7, 1987. Defendants contend that the two-year limitation period began to run either when the contamination of the water wells was first discovered or, at the latest, when Defendants were identified as PRP's.[4]

As a general proposition, "a statute of limitation begins to run upon the occurrence of the essential facts which constitute the cause of action." See Simmons v. Ocean, 544 F. Supp. 841, 843 (D.V.I. 1982) (citing Wilcox v. Executors of Plummer, 29 U.S. (4 Pet.) 172, 180, 7 L.Ed. 821 (1830)). However, under Virgin Islands law, the "discovery rule" applies. The discovery rule recognizes that under some circumstances, a person may be aware of an injury but not know its cause. Under the discovery rule, the statute of limitations is tolled until the injured party knows or should reasonably know the cause. Therefore, in order to determine the timeliness of Plaintiffs' claims for negligence against EXXON, ESSORICO, and

---

[4] There is nothing in the record stating the specific date a Defendant became a PRP or when this fact would have been discoverable by Plaintiffs.

ESSOVI and the third-party claims and counterclaims by the Esso Defendants and Texaco against the LAGA Defendants, L'Henri and Ramsay, the court must first determine when Plaintiffs and the other movants knew or should have known that these Defendants' activities were a cause of Plaintiffs' injury.

Plaintiffs suggest that under Virgin Islands law, the limitation period begins to run only when a party has knowledge or awareness of both "the injury *and its cause* through the exercise of reasonable diligence." Joseph v. Hess Oil, 867 F.2d 179, 184 (3d Cir. 1989) (emphasis added). Plaintiffs argue that in discerning cause, the case law requires them to show some link between the injury to their wells and Defendants' conduct. They contend that it took over two years of intensive discovery before they unearthed sufficient facts to show a causal relationship between the injury to their property and the conduct of EXXON, ESSORICO, and ESSOVI. Consequently, argue Plaintiffs, their claims did not accrue against these Defendants until they obtained the information linking their injury to the Defendants' conduct.

■ In determining when a claim has accrued in an action for tortious injury to real property, courts generally apply a rule, recognized as an exception to the simple discovery rule, often called the "continuing violation doctrine." See e.g., Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1129 (3d Cir. 1988). Under the continuing violation doctrine, the running of the statute of limitations is postponed in situations involving continuing or repeated wrongs. See generally William B. Johnson, Annotation, *Application of Statute of Limitations In Private Tort Actions Based On Injury To Person Or Property Caused By Underground Flow of Contaminants*, 11 A.L.R. 5th, 438 (1993) (collecting cases). In determining whether the injury alleged is "renewing" or "recurring"[5], courts consider whether (1) the injury to the property was permanent or temporary, (2) the property remained contaminated at the time of the claim, and (3) the seepage of contaminants had ceased or was ongoing.

---

[5] In some states the word "continuing" is defined or interpreted to mean "having continued without interruption from the date of discovery." See Wilson v. Mcleod Oil Co., 327 N.C. 491, 398 S.E.2d 586 (1990). In these states the cases distinguish between injuries that continue without interruption and injuries that occur anew every day so as to be "recurring" or "renewing" or "repeatedly occurring." Id., see also Kulpa v. Stewart's Ice Cream, 144 A.D.2d 205, 534 N.Y.S.2d 518 (3d Dep't 1988).

Plaintiffs allege Defendants engaged in conduct that is presently continuing to injure their property. Plaintiffs allege that contaminants from the underground storage tanks continue to seep into the underground water that feeds Plaintiffs' wells. As a result, under the applicable law, the court will apply the continuing violation doctrine in determining when Plaintiffs' claims accrued.

1. *Statute of Limitations as Bar to Claims Against Defendant ESSOVI*

ESSOSA transferred ownership of the Esso Tutu Station and underground storage tanks to ESSOVI sometime after the discovery of the contamination of the wells. ESSOVI, in its motions to dismiss Plaintiffs' amended complaints, assiduously avoids stating the specific date of the transfer of assets. However, ESSOVI states that the court should grant its motion to dismiss for failure to state a claim because "ESSOVI did not own, lease or operate the Esso Tutu Station or underground storage tanks until 1989 at the very earliest."

PID / Harthmans, in their response to the motion, state that "ESSOVI did not become record owner of the Esso Tutu Service Station until April 11, 1989 by virtue of a deed from ESSOSA dated January 3, 1989." Plaintiff Four Winds points out that the "Certification of Resolution" of ESSOVI accepting ESSOSA's assets and liabilities is not dated until June 11, 1991, notwithstanding ESSOSA's "Certificate" dated January 3, 1989 transferring those assets. Plaintiffs argue that the facts necessary to form a basis for ESSOVI's liability were not available from the face of any documents available to the public, but were revealed only through discovery, on or about December 1991. ESSOVI replies that there were public documents available to Plaintiffs before the filing of their complaint in March 1992 that established the presence of ESSOVI in connection with the Esso Tutu Service station. ESSOVI points to the "deed from ESSOSA dated January 3, 1989" as establishing the critical link. Thus, ESSOVI suggests that the accrual date of the claims should be either January 3, 1989 or at the very latest April 11, 1989. Plaintiffs argue that the claims accrued in December 1991, when they discovered that ESSOVI had assumed the liabilities and assets of ESSOSA.

◼ Though the question of what statute of limitation applies is one of law to be resolved by the court, the issue of whether the plaintiffs exercised reasonable diligence in bringing their claims against ESSOVI presents a question of fact. As is evidence from the

court's recitation of the parties' contentions, and the evidence and affidavits submitted with the motions and responses, a material issue of fact exists as to whether the parties should have known in 1989 that they had a cause of action for negligence against ESSOVI. The plaintiffs have introduced evidence tending to show that critical information concerning ESSOVI's potential liability was in the hands of ESSOSA or ESSOVI. Consequently, the question of whether the parties lacked diligence in pursuing their claims against ESSOVI is one appropriately reserved for trial. See Joseph, 867 F.2d at 184. The same reasoning applies to the question of whether the two-year limitation period operates to bar Plaintiffs' nuisance and strict liability claims against ESSOVI.

As to the nuisance claims, the analysis is different, and turns on whether the nuisance is temporary and thus may be abated, or whether it is permanent. Actual damage is yet to be ascertained and Plaintiffs submit that additional discovery is required to determine whether the injury is permanent. Here, the interference with the use and enjoyment of Plaintiffs' property continues; that is, the wells remain contaminated and closed. In a private nuisance action alleging damage to property, this court has held that "[a]s long as the disturbance of possession continues, the statute of limitations cannot expire." Rodgers v. Ibec Housing Co., 12 V.I. 166 (1975). In Kulpa, 534 N.Y.S.2d at 520, the court explained that "[w]here, as here, a private continuing nuisance arises out of negligence and is alleged to be recurring, the wrong is not referable exclusively to the day when the original tort was committed." In a water pollution action where a private continuing nuisance was alleged, the Kulpa court, in determining whether the action was time-barred, held that:

> even though [the defendant] acted promptly in draining its tank . . . when it was notified of a leak and in replacing all three of its alleg[ation] in her bill of particulars that the last test performed on the well showed unacceptable levels of gasoline in the well . . . raised an issue of fact . . . which required jury determination.

Id. at 534 N.Y.S.2d at 520.

As other courts have explained, where the wrongful conduct continues and the nuisance is maintained, every continuance tolls the statute of limitation. See Citizen & Southern Trust Co. v.

Phillips Petroleum Co. 385 S.E.2d 426, 428 (Ga. App. 1989). Because the invasion to the wells continues, and Plaintiffs have argued that the question as to whether the damage is permanent or temporary is yet to be determined, Plaintiffs' nuisance claims are timely under the two-year statute of limitations.

■ Finally, ESSOVI's alternative request for dismissal for failure to state a claim, "insofar as ESSOVI did not own, lease or operate the Esso Tutu station or underground storage tanks until 1989," must also be denied. This ground for dismissal also tests the sufficiency of Plaintiffs' complaints. In determining whether a complaint should be dismissed for failure to state a claim, the court is limited to the facts as alleged in the complaint. The complaint may not be dismissed unless the court finds, viewing all reasonable inferences in the light most favorable to the plaintiff that the plaintiff can prove no set of facts in support of the claim that would entitle him to relief. See Conley v. Gibson, 355 U.S. 41, 45–46, 78 S. Ct. 99, 102 (1957); Ferris v. Virgin Islands Indus. Gases, 21 V.I. 183, 186 (1987). In addition, on a motion to dismiss the court must accept as true all allegations in the complaint, and may consider as part of the "complaint" documents relied upon by the plaintiffs. See Chester County Interm. Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990).

As discussed earlier, an issue of fact exists as to the extent of ESSOVI's assumption of assets and liabilities of ESSOSA. Accepting as true Plaintiffs' allegation that the potential liability as to the contamination was known to ESSOSA, and that ESSOVI assumed the assets and liabilities of ESSOSA, the court cannot conclude that the complaints against ESSOVI are legally insufficient.

2. *Statute of Limitations as Bar to Claims Against Defendant ESSORICO and EXXON*

ESSORICO and EXXON move to dismiss as untimely the claims for negligence, nuisance, and strict liability set forth in PID/Harthmans' Fourth Amended Complaint and Four Winds' Second Amended Complaint. PID/Harthmans filed their Fourth Amended Complaint adding EXXON and ESSORICO as defendants on or about March 2, 1992. Four Winds added EXXON as a defendant in its First Amended Complaint, filed on or about March 2, 1992. ESSORICO was added as a defendant in Four Winds' Second Amended Complaint, filed on or about March 1, 1993. EXXON and

61

ESSORICO contend that Plaintiffs' claims for negligence, nuisance, and strict liability are governed by the two-year statute of limitation, Virgin Islands Code Ann. tit. 5, § 31(5)(A), and accrued no later than July 1987, when the contamination was first discovered. Therefore, EXXON and ESSORICO argue that these claims, filed over two years after the statute of limitations had run, are time-barred.

Plaintiffs argue that the six-year statute of limitation applies, and that even if the court were to find that the claims are governed by a two-year limitation period, the discovery rule would apply to toll the running of the statute. Alternatively, Plaintiffs argue that because EXXON is the parent of its wholly owned subsidiary ESSOSA, which was named in the original complaint, and ESSORICO is the wholly owned subsidiary of ESSOSA, the claims relate back to the filing of the first complaint.

First, the court notes that as to Defendants' motion to dismiss the nuisance claims in the amended complaints, the analysis of the ESSOVI motion to dismiss this claim applies and the nuisance claims are timely as against EXXON and ESSORICO. Plaintiffs' first argument—that the six-year statute of limitations applies—is made moot by the court's earlier finding that the two-year statute of limitations governs these claims, which sound in tort.

■ Plaintiffs' second argument is that the discovery rule applies because it was not until the December 1991 series of depositions that they "discovered" evidence that EXXON and ESSORICO engaged in conduct that would make these Defendants directly responsible for the injury to Plaintiffs. Specifically, Plaintiffs contend that it was through discovery that they learned that ESSORICO provided the expertise, personnel, budgetary process, supervision, and related services to the Esso Tutu Service Station for the design, construction, repair, and maintenance of the station and its equipment, including the underground storage tanks used for storing gasoline and waste products. As to EXXON, Plaintiffs contend that the depositions of EXXON's officers revealed that EXXON, through its corporate Environment and Safety Department ["E&SD"], retained control of the environmental activities of its affiliates. EXXON, through its departments, controlled, directed, and provided the capital for the design, repair, and replacement of the underground storage tanks. According to Four Winds, discovery revealed that "Exxon dictates policy, approves or rejects budget

submissions, and in particular, dictates underground tank assessment, management and capital funding for replacement." See Four Winds' Resp. Opp'n EXXON's Mot. to Dismiss at 20. Because the identity of the actor or actors whose conduct may be responsible for the injury sustained must be established before the action may lie, the discovery rule operates to postpone the accrual of the action until the plaintiff learns or, through the exercise of reasonable diligence, should have learned the facts necessary to fully state a claim. Based upon the foregoing, the court finds that the claims for negligence and strict liability as against EXXON and ESSORICO did not accrue until Plaintiffs, in the exercise of reasonable diligence, should have obtained the facts essential to their claims.

a. *ESSORICO's Motion to Dismiss Four Winds' Second Amended Complaint*

The question of whether Four Winds' Second Amended Complaint is timely as against ESSORICO remains unresolved. Should the finder of fact fix the accrual date of the claims as December 1991, the statute of limitations governing Four Winds' claims for negligence, nuisance, and strict liability against ESSORICO, filed on March 1, 1993, has not yet expired. Nevertheless, ESSORICO maintains that the limitation period of the claims against it ran on or before July 7, 1989. Four Winds argues that under Fed. R. Civ. P. 15(c), the amended complaint adding ESSORICO as a defendant relates back both to the original complaint and to the first amended complaint.

In its First Amended Complaint, Plaintiff alleged as follows at Paragraph 7:

ESSOVI is a Delaware corporation and currently owns and operates Tutu Esso having assumed the operation from Daniel Bayard pursuant to an agreement for consideration on or about December 6, 1990. ESSORICO, upon information and belief, is a division of ESSOSA and designed and supervised the construction of Tutu Esso. ESSORICO further supplied engineering services and environmental expertise to Tutu Esso from the initial sale of the service station to current date.

Paragraph 29 of the First Amended Complaint alleges further:

Investigation has revealed that substantial quantities of hazardous substances, wastes, and pollutants were introduced into the underground storage tank at Tutu Esso which was de-

signed by ESSORICO to store these substances. This tank was never maintained subsequent to its installation and was known, or should have been known, to the owners and operators of the service station to be leaking these substances into the Turpentine Run Aquifer.

Four Winds argues that it made a mistake as to ESSORICO's capacity to be sued. Four Winds states that a brief explanation of EXXON'S corporate structure is necessary to place its mistake in perspective. EXXON, it is explained, operates its business through operating divisions. For example, EXXON operates under the fictitious name of Exxon Company International ["ECI"], registered under the law of New Jersey. ECI, an unincorporated division of EXXON, operates and supervises the business of EXXON outside the Continental United States. Esso Caribbean and Central America ["ECCA"] is an EXXON division which operates and supervises the business of EXXON in the Caribbean and Central America. Management of ECCA reports to a contact director in ECI. Esso Central Caribbean Division ["ECCD"] is another EXXON division which operates and supervises the business of EXXON in the Central Caribbean including, but not limited to, Puerto Rico and the United States Virgin Islands. The management of ECCD reports to the management of ECCA. Four Winds then explains that its due diligence sources were conflicting as to whether ESSORICO was operated as a mere division of EXXON or whether it was an EXXON subsidiary that may be sued in its own right. In addition, Four Winds contends the deposition testimony of Mr. C. Stuart Griffith, the president of ESSORICO, added to the obscurity of ESSORICO's corporate status. Four Winds submits that during the December 1991 depositions of Mr. Griffith, he admitted that "ESSORICO is a wholly owned subsidiary of ESSOSA," but denied that he had "knowledge of the specifics of the organizational corporate structures." As a result, Four Winds admits it concluded, incorrectly, that ESSORICO was a Division, and not a corporation that may be sued in its own right.

Recently amended Rule 15(c), which governs the relation back of amendments adding parties or claims, provides in relevant part:

An Amendment of a pleading relates back to the date of the original pleading when

(1) Relation back is permitted by the law that provides the statute of limitations applicable to the action, or

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in the original pleading, or

(3) the amendment changes a party or *naming of a party* against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(j) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (b) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party. (emphasis added).

The chief consideration in determining the applicability of the equitable doctrine of 'relation back' is prejudice to the opposing party. Each prong of the Supreme Court's four-prong test articulated in Schiavone v. Fortune, 477 U.S. 21, 106 S.Ct. at 2384, 91 L. Ed. 2d 18 (1986), is satisfied. This test, which is consistent with newly amended Rule 15(c), states that an amendment relates back if:

(1) the basic claim . . . [arose] out of the conduct set forth in the original pleading; (2) the party to be brought in . . . receive(d) such notice that it will not be prejudiced in maintaining its defense; (3) the party . . . [knew] or should have known that but for a mistake in identity, the action would have been brought against it; and (4) the second and third requirements . . . [are] fulfilled within the prescribed limitations period.

On the facts of this case, it is readily apparent that the first requirement is satisfied. As to the notice requirement, the facts show that (1) ESSORICO is a wholly-owned subsidiary of ESSOSA, named in the original complaint; and (2) it is alleged that one of ESSORICO's primary corporate purposes was the design and installation of the storage systems (for ESSOSA) which Plaintiff asserts have failed. Besides this indication of an "identity of interest,"[6] the corporations share the same headquarters, the same

---

[6] Courts have found notice to exist when there is identity of interests between the original defendant and the newly named defendant. See E.I. Dupont de Nem-

corporate officers, the same resident agent in the Virgin Islands for service of process, and last, but by no means least, the corporations are represented by the same attorneys.

The facts show that even if the notice requirement was not satisfied by the filing of the original complaint against ESSOSA, it was satisfied by the filing of the First Amended Complaint. It is apparent that based on paragraph 7 of Four Winds' First Amended Complaint, ESSORICO knew or should have known that but for a mistake in identity, it would have been named as a party. The court has found that the First Amended Complaint was filed and served on ESSOSA within the prescribed limitation period.

Here, the court can divine no prejudice to ESSORICO. It is clear that but for Four Winds' mistaken conclusion that ESSORICO was a mere division and not a corporation, ESSORICO would have been named as a defendant in Four Winds' First Amended Complaint. Early in the history of Rule 15(c), the Supreme Court announced that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Conley v. Gibson, 355 U.S. 41, 48, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957).

It is beyond doubt that the Defendant here has received the notice that the statute of limitations is intended to afford. Indeed, as the court has inferred, ESSORICO was on notice of the facts out of which the action arose and of its potential liability as a defendant since the original complaint was filed in 1989. Moreover, PID/ Harthmans, who concluded correctly that ESSORICO could be sued in its own capacity, added ESSORICO as a defendant in their Fourth Amended Complaint. Certainly, ESSORICO cannot deny it was given notice then of its potential liability in this litigation. PID/Harthmans' Fourth Amended Complaint adding ESSORICO as a defendant was filed in March 1992 simultaneously with Four Winds' First Amended Complaint that mistakenly identified ESSORICO as a division of EXXON. As our Court of Appeals has

ours v. Phillip Petroleum Co., 621 F. Supp. 310 (Del. 1985) (finding notice requirement satisfied because of identity of interest between a parent and wholly-owned subsidiary); Seber v. Daniels Transfer Co., 618 F. Supp. 1311, 1314 (E.D. Pa. 1985); see also Sier v. A.R. Riise. Inc., 19 V.I. 335 (1982); 6A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1499, at 143 (2d ed. 1990).

reiterated, in opposing a Rule 15(c) motion "the non-moving party must do more than merely claim prejudice; 'it must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered . . . had the amendments been timely.'" Bechtel v. Robinson, 886 F.2d at 652 (quoting Heyl & Patterson Int'l, 663 F.2d at 426 (citing Dakyne v. Comm'rs of Lewes, 416 F.2d 290, 300 (3d Cir. 1969))). ESSORICO's ability to defend this action has not been prejudiced. Therefore, the court concludes that justice requires that Four Winds be allowed to "freely amend" its complaint to name ESSORICO as a defendant.

### III. MAY EXXON BE HELD LIABLE UNDER THE ALTER EGO/VEIL PIERCING DOCTRINE?

EXXON also moves for dismissal from the action entirely on the ground that Plaintiffs failed adequately to plead facts that would allow for piercing of its corporate structure. According to EXXON, Plaintiffs have failed to allege exceptional circumstances that justify corporate veil-piercing. EXXON contends that the court must consider only the pleadings and not the "voluminous extraneous matters and argument of plaintiffs beyond the face of the pleadings." Looking only to the allegations of the complaints, EXXON maintains that there is no allegation (1) that the corporate structure has been used for the purpose of committing a fraud, or of "injustice" in the use or formation of the corporate structure; and (2) that the subsidiaries are under-capitalized. As such, EXXON argues Plaintiffs "have not and cannot make" allegations sufficient to demonstrate the exceptional circumstances which would require disregard of the separate identity of the two corporate entities.

As a general rule, a parent corporation will not be held liable for the obligations of its subsidiary. See 1 William Fletcher, Cyclopedia of Corporations § 43 [hereinafter Fletcher]. As between parent and subsidiary, there is a presumption of separateness, and a plaintiff has a heavy burden to overcome that presumption to establish the liability of the parent. To warrant disregard of corporate separateness, the plaintiff must show more than that the parent owns the majority or all of the stock of the subsidiary and more than that the officers, directors, and managers are identical. There must be a showing that the parent intended to defraud or to escape liability or "that the parent exercised such dominion over finances, policies and practices that the controlled corporation has, so to speak, no

separate mind, will or existence of its own and is but a conduit for its principal." Id. Upon the proper showing, however, corporate separateness between parent and subsidiary may be disregarded, and the parent, the ultimate party in interest, may be liable.

Courts have identified a veritable litany of factors, the presence of all or a combination of some of which tend to favor disregard of the corporate entity. In American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, 736 F.2d 879, 886 (3d Cir. 1984), the Court of Appeals for the Third Circuit expressly endorsed the Fourth Circuit's list of factors. First among the factors to be considered is gross under-capitalization. The other factors include but are not limited to:

> failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

In American Bell, the court observed that "this set of requirements is by no means the exclusive approach to corporate veil piercing." Id. Other factors associated with the doctrine of corporate veil piercing are:

> the parent and the subsidiary having common business departments; the parent and subsidiary file consolidated financial statements and tax returns; the parent caused the incorporation of the subsidiary; the parent pays the salaries and other expenses of the subsidiary; the parent uses the subsidiary's property as its own.

1 Fletcher, § 43.

Indeed, courts addressing the inherently factual question of corporate identity have analyzed the question on an "alter ego," "mere instrumentality," or "agency" theory. Some cases analyze the question using these terms interchangeably; other courts have distinguished the agency theory as not requiring a showing of fraud or inequity. See Phoenix Canada Oil Co. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988); see also American Bell, 736 F.2d at 887 (citing Publicker Indus., Inc. v. Roman Ceramics Corp., 603 F.2d 1065, 1070 (3d Cir. 1979)); Japan Petroleum Co. (Nigeria) Ltd. v.

Ashland Oil, 456 F. Supp. 831, 839 (D. Del. 1978) (quoting Pacific Can Co. v. Hewes, 95 F.2d 42 (9th Cir. 1938)).

The cases show that no one fact is talismanic; that is, no one fact will render a parent liable for the actions of its subsidiary. Neither must all the above identified factors be present. In Anderson v. Lorch-Schierning, 20 V.I. 200 (1983), upon which Plaintiffs rely and which EXXON describes as being less than a "beacon of clarity," this court allowed for the piercing of the corporate veil on a showing that (1) the corporation was formed solely to receive one piece of property; (2) the subsidiary sold no stock and engaged in no corporate activity; and (3) certain corporate formalities were disregarded.

In their complaints and responses, Plaintiffs allege that, as between EXXON and its subsidiaries, there is a failure to observe corporate formalities, that the subsidiaries operate as divisions or departments of EXXON, and that with respect to environmental policies and programs, the subsidiaries act as extensions of EXXON because EXXON, through its operating divisions, "establishes safety and environmental control standards . . . approve major capital expenditures for environmental programs . . . including, but not limited to, the replacement, retrofitting, or relining of underground storage tanks for gasoline products and other hazardous substances, wastes, pollutants, contaminants, and materials." Four Winds' First Am. Compl. ¶¶ 8, 9; also PID/Harthmans' Fourth Am. Compl. ¶ 23. In sum, Plaintiffs allege that with respect to the environmental and safety programs, the corporations acted with disregard of their corporate separateness. From the totality of their allegations, Plaintiffs appear to proceed on an agency theory of parent-subsidiary liability.

■ The court agrees with EXXON that Plaintiffs have failed to present sufficient facts to warrant disregard of the principle of corporate separateness. However, on this record, the court cannot conclude, as did EXXON, that Plaintiffs "cannot make allegations sufficient to demonstrate the exceptional circumstances" for corporate veil piercing. Fed. R. Civ. P. 12(b)(6) provides that if:

> on a motion to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside of the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and dis-

posed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56.

Earlier, the court acknowledged that the "question of corporate identity is one of fact; and each case [must] be determined according to its own circumstances." 1 Fletcher § 43. Plaintiffs have presented some evidence tending to justify a finding of parental liability,[7] but insufficient to satisfy their heavy burden of proof. Though it might be doubtful whether Plaintiffs will ultimately prevail on the merits of their claims against EXXON, it does not appear beyond a doubt that they can prove no set of facts in support of their claims. Accordingly, Exxon's motions to dismiss the complaints are denied. Plaintiffs will be allowed the time to engage in the necessary discovery to supplement their pleadings, and EXXON will be given the opportunity to renew its argument on a motion for summary judgment.

## IV. TEXACO, INC.'s MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Texaco, Inc. moves under Fed. R. Civ. P. 12(b)(2) for dismissal of the PID/Harthmans' Complaint[8] and of L'Henri's cross-claim. Texaco alleges that the court lacks personal jurisdiction over it, contending that the complaint and cross-claim fail to show that Texaco's activity in the jurisdiction is sufficiently continuous and substantial to meet due process requirements. Texaco contends that it has no employees, maintains no offices, sells no products, and derives no revenue from activities within the Virgin Islands. Texaco argues that because it is without contacts, let alone "continuous or substantial" contacts, within the Virgin Islands, it lacks the requisite forum-related contacts so as to be "present" within the jurisdiction.

---

[7] EXXON argues that because it failed to present documents pertinent to its motion, the court may not consider documents outside the complaint. This argument overlooks the rule that permits courts to treat as part of the complaint documents relied upon by a plaintiff in its complaint. See Chester County Interm. Unit. v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990). Thus, the documents attached to Plaintiffs' responses were considered for the purpose of determining whether Plaintiffs have stated a cause of action that, if proved, would entitle them to relief. See Conley v. Gibson, 355 U.S. 41, 45–46 (1957).

[8] The Texaco Defendants have settled with Plaintiff Four Winds.

Moreover, Texaco contends that PID/Harthmans' and L'Henri's attempts to impute the jurisdictional contacts to the forum of its indirect subsidiary, Texaco Caribbean, Inc. ["Texaco Caribbean"] must fail. Relying on Keeton v. Hustler Magazine. Inc., 465 U.S. 770, 778 (1984), and Southmark Corp. v. Life Investors, Inc., 851 F.2d 763, 773 (5th Cir. 1988), Texaco argues that a parent corporation's contacts with the forum must be independently examined because the subsidiary's presence in the forum is not to be imputed automatically to the parent.

Texaco argues that its presence in the Virgin Islands is difficult to analyze because it is non-existent. Texaco submits that Texaco, Inc., a Delaware corporation with its headquarters in White Plains, New York, is a holding company. Texaco admits it holds common stock of manufacturing companies such as Texaco Refining and Marketing, Inc., ["Texaco Refining"]. Texaco Refining, which is headquartered in Houston, Texas, owns "vast manufacturing assets" and stock of certain other holding and manufacturing companies. One of the companies owned by Texaco Refining is Texaco Overseas Holding, Inc. ["Texaco Overseas"], another Delaware corporation, which in turn holds the stock of Texaco Caribbean, Inc. Texaco Caribbean is an operating company licensed to do business in the Virgin Islands and is doing business in the Virgin Islands.

Texaco alleges that, in contrast to Texaco Caribbean, it does not operate in the Virgin Islands. Through its affiant, Mr. Koch, Texaco avers that, as a holding company, it puts no product in the stream of commerce which would reach the Virgin Islands; it collects no revenues in the Virgin Islands; and it does not derive revenues from any sales or agents in the Virgin Islands.

The pleadings allege that Texaco is at the top of a vertically integrated corporate structure and is the parent of its wholly owned subsidiary, Texaco Overseas, which in turn is the parent of the wholly-owned subsidiary, Texaco Caribbean. It is further alleged that Texaco controls the activities of its subsidiary, Texaco Caribbean.

The non-movants argue that Texaco represented to the Securities and Exchange Commission ["SEC"] in the Form 10-k it filed with that office for the fiscal year December 31, 1988 that its subsidiary companies "represent a vertically integrated enterprise engaged in world-wide exploration for the production, transportation, refining, and marketing of . . . petroleum products." Texaco Form 10-k

71

at 1, L'Henri Ex. 3. The parties point out that Texaco further states in this document that it "owns, leases, or has interests in extensive production, manufacturing, marketing, transportation and other facilities throughout the world." L'Henri Ex. 3 at 2.

The non-movants point to Texaco's 1988 Annual Report, in which it states that "Texaco is the number one retail marketer in the Caribbean, commanding a 25% share of the market." They also bring to the court's attention Texaco's boast in its annual report that "as the leading integrated oil company . . . [it provides] opportunities to build incremental margins at every step in the chain—from exploration to the pump." L'Henri Ex. 4. The non-movants contend that the 1988 Annual Report addresses Texaco's worldwide marketing strategy as a policy implemented from the top. L'Henri notes specifically that at page 3, the Annual Report discusses the "System 2000 stations," which standardized the appearances of all Texaco Stations, and which was introduced by Texaco to revolutionize "our world-wide retail marketing program." Respondents argue that the integrated network appears to include corporate responsibility for environmental regulation and control with respect to "the production, storage, and sale of gasoline at all levels of its integrated network" of companies. See L'Henri's Resp. to Texaco's Mot. to Dismiss at 5.

The non-movants claim the evidence shows that Texaco controls the environmental policies of Texaco Caribbean through a division of Texaco known as Texaco Latin America/West Africa ["Texaco La/Wa"]. L'Henri Ex. 5, Dep. of Kenneth Etheridge, Manager of Operations of Texaco La/Wa. The parties also introduce evidence tending to show that Texaco maintains additional control over its subsidiaries and Texaco service stations under its Preventative Maintenance Programs. L'Henri Ex. 6.

Finally, non-movants urge the court to take judicial notice of the fact that Texaco's subsidiaries use trademarks of Texaco and that Texaco benefits directly from this marketing and advertising strategy. They point out that all Texaco stations must bear the familiar and identifiable "Texaco Star."

The resolution of a motion to dismiss for lack of personal jurisdiction is dependent on factual issues outside the pleadings. The plaintiff, as the party asserting personal jurisdiction, has the burden of establishing it. 2A James W. Moore et al., Moore's Federal Practice ¶ 2-2 (2d ed. 1993). This burden of proof cannot be met by

the allegations of the pleadings alone; rather, the plaintiff is required to establish facts supporting the court's jurisdiction through affidavits and the introduction of other competent evidence. See Time Share Vacation v. Atlantic Resorts, Ltd., 735 F.2d 61 (3d Cir. 1984). The plaintiff need only make a prima facie showing that jurisdiction exists to survive the motion to dismiss. At this stage, all allegations of jurisdictional facts are considered in a light most favorable to an assertion of in personam jurisdiction. However, this presumption may be overcome at trial or upon a hearing on the motion.

When a federal court sits in diversity, its exercise of personal jurisdiction over a non-resident defendant pursuant to Fed. R. Civ. P. 4(e) must comport with the long-arm statute of the forum and with the Due Process clause of the Fourteenth Amendment, which requires that the defendant have certain "minimum contacts" with the forum. International Shoe Co. v. Washington, 326 U.S. 310 (1945).[9] It is Plaintiffs' and Cross-claimant's burden to establish by a preponderance of the evidence that the long arm statute has been satisfied and that minimum contacts exist. Patterson By Patterson v. F.B.I., 893 F.2d 595, 604 (3d Cir. 1989), cert. denied, 111 S. Ct. 48 (1990). Plaintiffs and Cross-claimant argue that the court may assert jurisdiction under two theories: (1) the court has personal jurisdiction over Texaco, Inc. under any section of the Virgin Islands long arm statute, Virgin Islands Code Ann. tit. 5, § 4903; and (2) Texaco is in fact "present" in the Virgin Islands by virtue of an agency and/or corporate-parent relationship with Texaco Caribbean.

Texaco makes two principal arguments against its amenability to the jurisdiction of this court. First, citing Southmark Corp. v. Life Investors, Inc., 851 F.2d 763, 774 n.18 (5th Cir. 1988), Texaco argues that "[s]o long as a parent and subsidiary maintain separate the distinct corporate entities, the presence of one in a forum may not be attributed to the other." The affidavits filed in support of Texaco's motion aver that Texaco and Texaco Caribbean are two separate and distinct entities, which maintain separate books and are managed by separate, non-overlapping boards of directors.

---

[9] There is some uncertainty as to whether the reach of the Virgin Islands long arm statute is co-extensive with the Due Process clause. See Carty v. Beech Aircraft Corp., 679 F.2d 1051, 1059 (3d Cir. 1982); Dennie v. University of Pittsburgh, 589 F. Supp. 348, 353 (D.V.I. 1984).

Though Texaco concedes that its "indirect subsidiary," Texaco Caribbean, is "present" and doing business in the Virgin Islands, Texaco maintains that the presence or "activities" of the subsidiary cannot fairly be.imputed to the parent.

Texaco avers that it has no employees, maintains no offices, sells no products, and derives no revenues from activities within the Virgin Islands. Texaco analogizes the claims alleged in this action to the "failure to warn" claims alleged in Carty v. Beech Aircraft, 679 F.2d 1051, 1061 (3d Cir. 1982), and argues that since, like the non-resident defendants in Carty, it has "not avail[ed] itself of the privilege of conducting activity within the forum," there are no connections for an assertion of jurisdiction.

Texaco's analogy to Carty is extremely attenuated. Unlike the case at bar, in Carty there was no tortious injury in the territory and the jurisdictional issue involved an isolated incident, the crash of an airplane outside of the Virgin Islands that resulted in the deaths of a number of passengers who did not live in the Virgin Islands. In addition, in Carty the defendants did not have a subsidiary "present" and "doing business" in the forum, as in this case. Carty analyzes, generally, the various sections of the Virgin Islands long arm statute applicable in this action and is authority for the general principles announced in that case. However, the facts of Carty are clearly distinguishable, and its holding was limited specifically to those special facts. See Carty, 679 F.2d at 1061 n.12.

The Virgin Islands long arm statute provides in part:

(a) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim for relief arising from the person's

(1) transacting any business in this territory;

(2) contracting to supply services or things in this territory;

(3) causing tortious injury by an act or omission in this territory;

(4) causing tortious injury in this territory by an act or omission outside this territory if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this territory

Both PID/Harthmans and L'Henri argue that any one of the provisions of the long-arm statute is sufficient to confer jurisdiction

over Texaco. However, they have confined their arguments to subdivision (a)(4). Under subdivision (a)(4), a non-resident defendant is subject to jurisdiction in the territory if the plaintiff can show that the defendant: (1) caused tortious injury in the territory and that he (a) regularly does or solicits business, (b) engages in any other persistent course of conduct, or (c) derives substantial revenue from goods consumed or services rendered in the territory.

■ As to the first element, there is no doubt that actual injury has occurred in the territory. PID/Harthmans' underground wells have become contaminated, allegedly as a result of the leaking of toxic substances from underground storage tanks belonging to, installed, and maintained by Texaco. Plaintiffs contend their claims arise out of the direct or indirect actions and/or omissions of Texaco in the Virgin Islands and outside of the Virgin Islands. Thus it is clear that the first element for the assertion of jurisdiction under subdivision (a)(4) is met.

As to the other elements of this ground for jurisdiction, the statute reads in the disjunctive. Plainly, establishing one of these remaining elements, by a preponderance of the evidence, is sufficient to make a prima facie showing of jurisdiction. However, where there is evidence of several of these requirements, but the evidence as to one element is less than overwhelming, our court of appeals has stated that the evidence of several of these factors "may be sufficient cumulatively to establish a jurisdictional presence, even though no single element would suffice." Hendrickson v. Reg O Co., 657 F.2d 9, 12 (3d Cir. 1981).

To prove jurisdiction, Plaintiffs submitted affidavits and other documents from which the court could conclude that Texaco is "transacting" or "doing business" in the forum both directly and indirectly. The deposition testimony of Texaco's representative, Etheridge, and other documents—for example, excerpts from Texaco's Preventive Maintenance manual for Service Station Equipment and Facilities—tend to show that Texaco does business directly in the forum. According to Etheridge, who is the Manager of Operations of Texaco La/Wa, a division of Texaco, Texaco La/Wa "has oversight over various Texaco subsidiaries" with respect to "marketing, service station design, standards of appearance," "oil spill response," and Texaco's "underground storage tank replacement program." L'Henri Ex. 7. Such "oversight" activities, ac-

75

cording to Etheridge, include trips to "overseas subsidiaries' locations for inspection and reviews." Etheridge also testified that "oversight" extended to the "retail service stations." Further, the representations of Texaco in the Form 10-k and the 1988 Annual Report totally contradict the claim that Texaco sells no product in and derives no revenue from the forum.[10]

Reviewing the various interpretations given the phrase "transacting business" or "doing business" by other courts, this court recognized "that at the outer limits of the due process clause," "a single act" may constitute the "transacting" of business within the meaning of section 4903(a)(1). Godfrey v. Int'l Moving Consultants. Inc., 18 V.I. 60, 67 (1980). Considered cumulatively, solicitation of business in the form of sending catalogues, price lists, and bulletins, and supplying technical advice by telephone on the servicing of equipment in use in the Virgin Islands, provide a sufficient nexus for the court's assertion of jurisdiction over a non-resident defendant. Hendrickson v. Reg O Co., 657 F.2d 9, 12 (3d Cir. 1981). The "personal and direct nature" of the overall solicitation in Hendrickson was highly significant. Likewise, the special nature of Texaco's assistance, geared as it is to a unified corporate purpose, is equally significant. Texaco did more than provide technical assist-

---

[10] Texaco's claim that it "puts no product into the stream of commerce which could reach the Virgin Islands" is based on its view of itself as a holding company. Texaco is not a company that simply holds controlling interests in various subsidiaries. Savin Corp. v. Heritage Copy Prods., Inc., 661 F. Supp. 463, 471 (M.D. Pa. 1987) (holding that activities of subsidiary conferring in personam jurisdiction not attributed to parent company who was "in the business of investment through the acquisition of interests in a variety of companies.").

The excerpts of Texaco's Form 10-k and 1988 Annual Report show that Texaco merges its business purpose with that of its subsidiaries. The policy programs instituted by Texaco that demand compliance by its subsidiaries demonstrate this unity of purpose. The subsidiaries are, as one court remarked, doing what the parent would otherwise have to do for itself. See Bullova Watch Co. v. K. Hattori & Co., 508 F. Supp. 1322, 1342 (E.D.N.Y. 1981) ("There are undoubtedly special reasons the defendant has chosen to operate . . . by means of incorporated subsidiaries. But these subsidiaries almost by definition are doing for their parent what their parent would otherwise have to do on its own. The question to ask is . . . whether in the truest sense, the subsidiaries' presence substitutes for the parent.") See also Gallagher v. Mazda Motor of Am., Inc., 781 F. Supp. 1079, 1085 (E.D. Pa. 1992). In these circumstances, assertion of personal jurisdiction over the parent have been found proper.

ance; it marketed and sold its special services to gain a greater share of the gasoline consuming public in the Virgin Islands. It engaged in a course of conduct of overseeing and implementing its policy programs with respect to both marketing and environmental control.

█ There is little doubt that Texaco has "acted" or "transacted" business directly in the Territory. There can be no doubt of the continuing nature of Texaco La/Wa's activities, and therefore Texaco's activities, in the forum, since they are to oversee and mandate implementation and compliance with Texaco's policy programs by the retail stations that, for all intents and purposes, are here to stay. Resolving all doubts as to the inferences of the evidence in a light most favorable to the non-movants, the court concludes that there is more than adequate evidence of Texaco's business efforts in the Territory.

Whether the assertion of jurisdiction satisfies the requirements of due process is dependent on a finding that the activities constituting "minimum contacts" with the forum are sufficient "so that maintenance of the suit would not offend notions of fair play and justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 164, 158, 90 L. Ed. 95 (1945). The exercise of jurisdiction is fair if "the defendant's conduct and connection with the forum state [are] such that it should reasonably anticipate being haled into court there." World-Wide Volkswagen Corn. v. Woodson, 444 U.S. 286, 297–298, 100 S. Ct. 559, 567, 62 L.Ed. 2d 490 (1980).

█ The court is convinced Texaco should have foreseen the possibility of being sued in the Territory. Of overwhelming significance in this case is Texaco's undertaking the responsibility for establishing environmental standards and control for its subsidiaries and the retail stations advertising the Texaco insignia. Texaco through its sub-division, Texaco La/Wa, opted to control the installation and replacement of the underground storage tanks throughout its integrated corporate system and in the Territory. The instant litigation arose from environmental contamination to an aquifer, due in part to leaking underground storage tanks. As the entity controlling the installation, maintenance, and replacement of these tanks, Texaco should have foreseen the possibility of being sued in a forum where the tanks were being used.

In addition, as Plaintiffs and Cross-claimants so strenuously argue, there is a sufficient evidentiary basis to impute the jurisdic-

tional contacts of the subsidiary to the corporate parent Texaco. See *supra* note 11. In its Annual Report, Texaco notices litigation pending against its subsidiaries. This fact convinces this court that the parent Texaco undoubtedly receives notice of papers served on its subsidiaries engaged in carrying out the functions so integral and vital to its success as "the leading integrated oil company." Consequently, imputing the jurisdictional contacts of the subsidiary is proper and the requirements of due process are clearly satisfied. See *Gallagher v. Mazda Motors of Am.*, 781 F. Supp. 1079, 1083–1085 (E.D. Pa. 1992) (identifying cases). Accordingly, Texaco's motions to dismiss the complaint of PID/Harthmans and the cross-claim of L'Henri are denied.

## V. STRICT LIABILITY

Count IV of the Fourth Amended Complaint and Count VI of the First Amended Complaint both state claims based on strict liability. Defendants have moved for dismissal of the strict liability counts, arguing that Plaintiffs have failed to state a claim upon which relief can be granted because the "mere ownership" of a service station is not the type of "ultra-hazardous" activity for which Defendants may be held strictly liable. Defendants contend that Plaintiffs failed adequately to plead that the operation and ownership of a service station is anything other than an activity which can be made safe by the exercise of reasonable care, and that Plaintiffs have failed to demonstrate the activity is other than a matter of common usage.

Plaintiffs allege in their strict liability counts that Defendants maintained underground storage tanks of petroleum and petroleum waste, highly volatile and toxic substances which are abnormally dangerous, in a residential area, near water wells supplying the public with fresh water for human consumption constituted a non-natural use of the premises and an "abnormally dangerous activity." See First Am. Compl. ¶¶ 80–85; Fourth Am. Compl. ¶¶ 72–73. Plaintiffs argue that what is inherently dangerous is not the mere ownership and/or operation of the service station but the storage of gasoline and toxic substances in underground storage tanks located near a residential area, underground water wells, and an aquifer from which thousands of Virgin Islanders obtain their water supply.

Strict or absolute liability is the concept of imposing liability for damage without regard to fault. Some scholars view the imposition

of strict liability as a question of risk distribution. See 3 Harper et al., The Law of Torts, § 14.3 at 196 (citing, among others, Guido Calabresi, Some Thoughts on Risk Distribution in the Law of Torts, 70 Yale L.J. 499, 544–545 (1961)).[11] Others see the doctrine as embodying the principal of law "that if a man takes a risk, which he ought not to take without also taking upon his shoulders the consequence of that risk, he shall pay for damages that ensues." 3 Harper et al., supra, § 14.4 at 212 (quoting Stallybras, *Dangerous Things and the Non-Natural User of Land*, 3 Cambridge L.J. 376, 387 (1929)).

In this case, the complaints allege that Defendants allowed dangerous substances and toxic waste, including gasoline and petroleum by-products brought onto and maintained under their control on their land, to escape and damage the aquifer that supplies water to Plaintiffs' wells. Plaintiffs argue that it is the maintenance or storage of the by-products and other toxic chemicals incident to Defendants' activities above an aquifer that makes the conduct ultra-hazardous. Thus, while it is true as Defendants contend, that "mere ownership or operation" of a service station normally does not constitute an activity upon which strict liability may be imposed, Plaintiffs are correct when they argue that the question is whether this storage of gasoline and toxic waste involved an appreciable risk of causing serious harm that could not be eliminated, regardless of the degree of care Defendants undertook.

PID/Harthmans suggest that the court approach the question as one involving conduct as embraced by "the rule of Rylands v.

---

[11] When negligence is the sole basis for recovery of damages caused by the conduct of dangerous activities, it must necessarily be that in some cases innocent victims will go uncompensated. The individualistic philosophy of laissez-faire sanctions this result on the theory that a person should not be held liable, no matter how innocent the victim, if he has done no "wrong." On the other hand, it is urged that the question is not one of "right or wrong" but one of who can best bear the loss—the person utilizing the exceptionally hazardous equipment or facility or the victim. The development of industry and business saw the rise of laissez-faire as the dominant economic philosophy and fault as the dominant principle of liability for the casualties of enterprise, each being a ramification in its sphere of the individualism of the age. Fault is still no doubt the dominant principle of liability. There is a growing belief, however, that in this mechanical age the victims of accidents can, as a class, ill afford to bear the loss; that the social consequences of uncompensated loss are of far greater importance than the amount of the loss itself; and that better results will come from distributing such losses among all the beneficiaries of the mechanical process than by letting compensation turn on an inquiry into fault.

Fletcher, or liability for the collection in dangerous quantities substances not naturally on the land." See 3 Harper et al., supra, § 14.1 at 184. Whether this is the better view need not be determined because all the parties agree that the issue is governed by sections 519 and 520 of the Restatement (Second) of Torts, which recognizes the Rylands v. Fletcher principle.

Section 519 states the general principle as follows:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
>
> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Section 520 lists six (6) factors which a court must consider in determining whether an activity is abnormally dangerous:

> (a) existence of high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

Factors (a) and (b) must be assessed by reference to the general principle stated in section 519. Professor Prosser states that an activity can be ultra-hazardous for two reasons:

> First because although harm from a mishap may not be very serious, and the social utility of the conduct may outweigh the danger, a mishap resulting in some harm to the plaintiff is very likely to occur; *second, because the activity involves an appreciable chance of causing serious injury.* (emphasis added).

Defendants concede that their storage tanks held chemicals, waste, and other by-products that were both highly toxic and inflammable, making the risk of harm great. Some risks may be reduced by due care to a point where the likelihood of harm is no

longer great. Plaintiffs contend, however, that the activity becomes abnormally dangerous because the storage drums or tanks are located and maintained "atop the Turpentine Run Basin Aquifer, which is the most productive aquifer on St. Thomas, . . . with numerous wells in the [aquifer] collectively . . . permitted to draw up to 1 million gallons per day from the aquifer" for distribution to the general pubic.

Defendants rely on Arlington Forest Associates v. Exxon Corp., 774 F. Supp. 387 (E.D. Va. 1991), for the contrary conclusion. There, the district court purporting to apply the six factors stated in section 520 under Virginia Law, denied recovery under strict liability for damage resulting from the seepage of gasoline from underground gasoline tanks. The Arlington court reasoned that:

> Maintained, monitored, and used with due care, underground gasoline storage tanks present virtually no risk of injury from seepage of their contents. They are not abnormally dangerous. Sound tanks, timely replacement of impaired tanks, modern corrosion control techniques, and adequate testing for leakage can eliminate all but a tolerably small amount of risk.

774 F. Supp. at 390. This court does not agree. Today, though "fault remains the dominant principle of liability for the casualties of enterprise," the protection of rapidly diminishing and irreplaceable natural resources (the environment), as opposed to protection of developing industry and embryonic businesses, is of current public concern, not the "individualism of the age." See supra note 8. Society's problem with the disposal and storage of toxic substances is well documented, and this court is aware of no "fail safe" solution. Depending on the locality, measures may be taken which would reduce the frequency of harm, but such measures would not, as the Arlington court intimated, eliminate the risk of great harm.

A conclusion contrary to that expressed in Arlington was reached by the court in Branch v. Western Petroleum. Inc., 657 P.2d 267 (Utah 1982). There, the Utah Supreme Court affirmed an award of damages on the basis of strict liability for the pollution of the Plaintiffs' water wells. In Branch, the court found it persuasive that all but seven jurisdictions had accepted the rule of Rylands v. Fletcher and that "[s]everal cases on comparable facts have applied strict liability due to the abnormal danger of polluting activity." Branch, 657 P.2d at 274 (collecting cases). It reasoned "that the common law rules of tort liability in pollution cases should be in con-

formity with the public policy of [the] state as declared by the legislature." Id. at 275 (citing Atlas Chem. Indus.. Inc. v. Anderson, 514 S.W.2d 309 (1974), aff'd, 524 S.W.2d 681 (Tex. Ct. App. 1975)).

■ It may well be, as Defendants contend, that operation and ownership of service stations is a matter of common usage and that it is not unusual today to find service stations in residential areas. But where, as here, the risk of seepage is contamination of the area's precious and limited water supply, locating the storage tanks above the aquifer created an abnormally dangerous and inappropriate use of the land.

The Restatement, in comment f, notes that consideration of these factors is to be undertaken with an awareness that they are interrelated and "that it is not possible to reduce abnormally dangerous activities to any definition." Indeed,

> In determining whether the danger is abnormal, the factors listed in Clause (a) to (f) of this section are all to be considered, and all are of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, it is not necessary that each of them be present, especially if others weigh heavily.

In this case, several of these factors are present: (1) there is a "high risk of some harm" from pollution to the wells; (2) the "likelihood of harm" of toxic substances contaminating the aquifer is great. Moreover, although the frequency of occurrence of this risk may be reduced by reasonable care, the risk cannot be eliminated. As such, the activity is clearly inappropriate to where it is maintained. Moreover, the community's interest in a clean water supply far outweighs the benefits of the service stations to the community. Indeed, the interest in "clean water" is protected by the Virgin Islands Legislature. See Virgin Islands Code Ann. tit. 19, §§ 1551–1564 (Solid and Hazardous Waste Management Act); Id. tit. 12, § 181 (Water Pollution Control Act).

There is no Virgin Islands precedent addressing the question of liability for pollution of underground water. The court is persuaded that the rule of strict liability applies to the facts of this case. Accordingly, the motions to dismiss the strict liability counts of the complaint are denied.

## VI. MOTION TO DISMISS FOUR WINDS' CLAIM UNDER CERCLA

EXXON argues that Four Winds' claim under CERCLA, in Count VII of the First Amended Complaint, fails to state a claim against EXXON for which relief may be granted because the complaint fails to allege that EXXON was either an "owner or an operator" as defined by the Act. CERCLA imposes liability on "owners and operators" of any facility for the disposal of hazardous substances or waste. If a party is a covered "person" under CERCLA, liability is strict. Specifically, 42 U.S.C. § 9601(20)(A) defines "owner or operator" to include "any person who owned, operated, or *otherwise controlled activities at such facility*." (emphasis added). Expressly excluded are persons "who, without participating in the management of a facility, hold[] indicia of ownership primarily to protect [a] security interest in the . . . facility." 42 U.S.C. § 9601(20)(A). So as not to frustrate the statute's remedial goals, the provisions of CERCLA are construed liberally. United States v. Kayser-Roth Corp., 910 F.2d 24 (1st Cir. 1990) (citations omitted).

A reasonable construction of this provision leads to the conclusion that if it can be shown that a person possessing an "indicia of ownership" of a facility participates in the management of the facility or otherwise controls activities at the facility, that person can be liable for clean-up costs under CERCLA. Four Winds in its First Amended Complaint alleges that EXXON controlled its subsidiaries' environmental policies and actively participated in the subsidiaries' handling, storage, and disposal of hazardous waste. See First Am. Compl. ¶¶ 8–9, 23. Accepting the allegations of the complaint as true, it appears that EXXON may be liable under CERCLA.

Other courts have interpreted this provision to impose "operator" liability under CERCLA on parent corporations. In Kayser-Roth the First Circuit Court of Appeals affirmed the district court holding that a parent corporation's pervasive control over the activities of a subsidiary warranted direct imposition of liability as an "operator." The court noted that, like here, the control of Kayser, the parent corporation, extended to "environmental matters including the approval of the installation of the cleaning systems that used the TCE." Kayser-Roth, 910 F.2d at 27.

This court is not persuaded by EXXON's contention that "nowhere does CERCLA identify 'parent corporations' as 'owners' or 'operators' who are liable for the actions of their subsidiaries." EX-

XON cites Joslyn Manufacturing Co. v. T.L. James Co., 893 F.2d 80 (5th Cir. 1990), cert. denied, 111 S. Ct. 1017 (1991), which holds that parent corporations are not liable under CERCLA for the activities of their subsidiaries, as authority for its assertion.

The opposite assertion is also true, for nowhere is there an indication that "parent corporations" are excluded from liability under CERCLA. In addition, the court agrees with Four Winds that EX-XON's reliance on Joslyn is misplaced, for it is obvious that the holding in Joslyn must be limited to its facts. In Joslyn, the court found that there was no participation by the parent in the activities of its subsidiaries. Moreover, Joslyn was distinguished by the Kayser-Roth court as "being concern[ed] primarily with owner rather than operator liability." Kayser-Roth, 910 F.2d at 27.

■ Based on the foregoing, it cannot be said that there is no liability under CERCLA for a "parent corporation" for the activities of its subsidiaries. Indeed, this court follows other courts, including a district court in this jurisdiction, in rejecting this argument. See Kayser-Roth, 910 F.2d at 27; United States v. Nicolet, Inc., 712 F. Supp. 1193, 1203 (E.D. Pa. 1989) (citing cases concurring in the conclusion that "the exemption from liability [found in Section 101(20) of CERCLA, 42 U.S.C. § 960(20)] gives rise to an inference that an individual who owns stock in a corporation and who actively participates in its management can be held liable for cleanup costs incurred as a result of improper disposal by the corporation.). Accordingly, EXXON's motion to dismiss the CERCLA claim is denied.

## VII. CLAIM UNDER THE VIRGIN ISLANDS SOLID WASTE MANAGEMENT ACT

All Defendants have moved to dismiss Four Winds' claim in Count II of its First Amended Complaint for indemnification and damages for violation of the Virgin Islands Solid and Hazardous Waste Management Act, Virgin Islands Code Ann. tit. 19, §§ 1551–1564. The complaint alleges that §§ 1551–1564 prohibit the storage, release, or discharge of hazardous substances, wastes, pollutants, contaminants, or materials in such a manner as to prejudice the public health, and that a private cause of action to enforce this Virgin Islands mandate should be implied.

Defendants contend that the Virgin Islands legislature did not provide for a private right of action and none should be implied.

Defendants argue that there is no lack of a state remedy, for arrest authority is given to peace officers, and in the case of permit violations, the legislature provides for the imposition of fines or imprisonment. Id. § 1562. Nor has the government ignored its duties to protect the rights of the citizens of the Virgin Islands. Defendants draw the court's attention to the fact that in this case, both the EPA and the DPNR have begun enforcement of federal and local environmental regulations against many of the Defendants and Plaintiffs in this litigation. Finally, Defendants argue there are other remedies, under the common law, which are available to Plaintiff, and thus there is no need for the judiciary to create an additional remedy for damages and compensation under this Act.

Four Winds' strongest argument for an implied right of action is that a legislative intent to acknowledge a private right of action may be inferred from the statutory language excluding from the Act's enforcement procedure "offenses cognizable in the district court or violations resulting in property damage or personal injury." Id. § 1561(f)(2). Citing Department of Labor v. Davidson, 25 V.I. 109, 112 (Terr. Ct. V.I. 1982) for authority, Four Winds contends that only by interpreting this clause to provide for additional remedies can "[e]very clause and word of the statute be given effect." In Davidson, the court observed that "[t]he cardinal rule of statutory instruction is to save not destroy." Four Winds also argues that, although it cannot be said that there has been governmental inaction, or that the DPNR acting through the EPA has neglected to act in the best interest of Virgin Islands citizenry, the action taken is less than the full relief that is available under the statute. Plaintiff points out that these government agencies commenced their investigation in August 1987, but did not issue an administrative order until March 1990, some thirty-one months later.

Plaintiffs contend that a private right of action may be implied to supplement the efforts of the local agencies. It argues that since its enactment in 1978, the government agencies "charged by the Hazardous Waste statutes with accepting 'appearances, waiver of trial, plea of guilty, and payment of costs and fines for violations' . . . report that the required schedules of offenses have never been published." The implication is that the statute is a toothless tiger, and absent some catastrophic event, which readily describes the contamination to the Tutu Turpentine Aquifer, the local government's efforts at enforcement will prove insufficient. Plaintiff argues that

this case presents the perfect example of how a private action under the Act may be used to supplement governmental efforts.

Plaintiff's arguments are very appealing; however, the court will consider them under the four-prong analysis stated in Cort v. Ash 422 U.S. 66, 78 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975). In the federal context, "in determining whether a private cause of action is implicit in a statute not expressly providing one, "the Supreme Court found the following factors relevant. Courts must consider whether:

(1) the statute creates a right in favor of the plaintiff—that is, is the plaintiff of the class for whose especial benefit the statute was enacted.

(2) there is an intent by the legislature, explicit or implicit, to create such a remedy or deny one.

(3) it would be consistent with the underlying scheme to imply such a remedy.

(4) other remedies are available that protect the right, and the sufficiency of those remedies.

Cort, 422 U.S. at 78, 95 S. Ct. 2080, 45 L. Ed. 2d 26.

In this instance, the statute does not create a special class of beneficiaries; its purpose is to protect the resources of the Virgin Islands and benefit the entire citizenship. As such, the first factor may be taken as being satisfied. The dispute rages over the second and third factors. The court's own close scrutiny of the Act discloses that the parties have emphasized correctly the two sections of the Act from which the legislature's intent "to create" and "to deny" such a remedy might be implied.

Pointing to section 1561(f)(2), Four Winds argues that it is clear from the statutory language that a private cause of action was contemplated by the legislature for violations of the statute "resulting in property or personal injury." However, even if the court were to agree that there is such an intent to create a private cause of action, it is not clear that implying a private right of action for indemnification and damages would be consistent with the underlying scheme of the statute. Defendants point to section 1564 and argue that if the governmental body with the authority to bring an action under the chapter may maintain an action only for injunctive relief, the court may not create a private right of action for indemnification and damages.

■ The court agrees that it would be engaging in "judicial legislation to hold that such a right was created by the Act." Whether a private right of action may be implied for injunctive relief, the court need not decide today. Accordingly, Four Winds' claim for "indemnification and damages" for violations of the Act must be dismissed for failing to state a claim upon which relief may be granted.

## VIII. LAGA DEFENDANTS' MOTION TO DISMISS

On or about March 2, 1992, with the filing of PID/Harthmans Fourth Amended Complaint, Four Winds' First Amended Complaint, and ESSOSA's Third Party Complaint, the LAGA Defendants became parties to the litigation. Plaintiffs[12] and several Defendants and Third-Party Defendants responded to the LAGA Defendants' motion to dismiss. The Texaco Defendants and Ramsay, in addition to their motions in opposition to the LAGA Defendants' motion to dismiss, moved to strike the affidavit of Richard A. Leland and the other documents submitted in support of the LAGA Defendants' motion. Leland is an attorney with the firm of Rosenman & Colin, which represents all of the LAGA Defendants. The court will consider these motions below.

As a preliminary matter the court will address the procedural issues raised by these motions. In support of their motion to dismiss, the LAGA Defendants appended extra-pleading material as is permitted under Fed. R. Civ. P. 12(b)(6). Among the documents included was an affidavit of Leland, counsel for the LAGA Defendants. The Texaco Defendants and Ramsay, as part of their responses to the motion to dismiss, moved to strike this affidavit as inadmissible hearsay and the documents attached to the affidavit as not properly authenticated and as hearsay upon hearsay. The Texaco Defendants and Ramsay also argue that the movants' introduction of documents in support of the motion to dismiss permits the court to convert the motion into one on summary judgment.

Upon examination of the affidavit, the court agrees that the Leland Affidavit would be inadmissible at trial, and is inadmissible under the standard required by Fed. R. Civ. P. 56(e) for a summary judgment motion. Many of the averments made in Leland's affi-

---

[12] The PID/Harthmans Plaintiffs adopted in full Four Winds' forty-nine page response to the LAGA Defendants' motion to dismiss.

davit are prefaced by the words "I have been informed by Mr. Lazare," or "Mr. Gal has informed me," indicating that the affiant, Leland, has no first-hand knowledge of the facts he seeks to introduce. As such, if this were a summary judgment motion under Rule 56, which goes to the merits of the claim, and tests whether there is genuine issue of material fact in dispute, the evidence would be deemed incompetent.

However, on a motion under Rule 12(b)(6), which tests the sufficiency of the complaint, the court has broad discretion in determining what matters to accept and what to exclude. Even though matters outside the pleading may be considered, the allegations of the complaint are the court's primary consideration on a motion to dismiss. Without converting the motion into one for summary judgment, a court may take into account documents relied upon by plaintiffs in their complaint, including those "matters of public record, orders, and items appearing in the record of the case." See 5A Charles A. Wright & Arthur R. Miller, supra, § 1357, at 299. Where the plaintiff has failed to introduce documents pertinent to the complaint, and the defendant has submitted such relevant documents on a motion to dismiss, the court is entitled to rely on such documents. See Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 (1st Cir. 1991). Even unauthenticated documents may be considered by the court, without converting the motion into one for summary judgment, if incorporated by reference by the plaintiff in the complaint. Thus, to the extent that the matters outside the pleading are incorporated by reference or relied upon in the complaints, those matters will be taken into account in the court's determination of this motion to dismiss.

Laga Industries, Ltd., Duplan Corp., and Panex Industries, Ltd. are successor enterprises of which Lazare and Gal were officers and directors or shareholders. Panex Corp. is a partnership, of which Lazare and Gal are the general partners. See First Am. Compl. ¶¶ 11–15; Fourth Am. Compl. ¶¶ 22–26. The complaints allege that from approximately 1971 through 1981, LAGA owned and operated a textile manufacturing business at the LAGA site, which is located above and about 250 feet west of a tributary of the Turpentine Run Aquifer. See First Am. Compl. ¶¶ 41–47; Fourth Am. Compl. ¶¶ 50–56. It is alleged that PCE, identified by the EPA as one of the pollutants in the aquifer, was used during the manufacturing process to dry-clean fabrics. The complaints allege, and the

88

LAGA Defendants admit, that Laga, Ltd. was incorporated in 1968 under the laws of the Virgin Islands and was dissolved in 1981 for failure to pay corporate franchise taxes.

Duplan was incorporated in Delaware with its principal place of business in New York. In 1970, Duplan became the sole shareholder of Laga, Ltd. Plaintiffs allege Duplan operated the textile manufacturing business of its subsidiary Laga, Ltd. during the years 1970 through 1981. On August 31, 1967, Duplan filed for Chapter XI reorganization under the Bankruptcy Act of the United States. The movants submit that by court order dated October 5, 1976, the bankruptcy proceeding was converted to a proceeding under Chapter X. Duplan, through its attorney, disputes Plaintiffs' allegation that operations at the Laga, Ltd. site ended in 1979, since the bankruptcy trustee "may have" ceased to operate earlier than 1979. However, Duplan concedes that operations ended at the very latest on August 28, 1979, when the court authorized the Duplan bankruptcy trustee to sell the Laga, Ltd. site.

It is alleged that in March 1981, Duplan emerged from bankruptcy under the name of Panex Industries, Inc., which was in turn dissolved on September 24, 1984. Plaintiffs allege and the movants admit that a certificate of dissolution was issued by the Secretary of State of Delaware on April 15, 1985.

By deed, from Duplan's trustee in bankruptcy, dated December 12, 1979, Panex Co. purchased the Laga, Ltd. building site, now occupied by the VIDE. Panex Co. is a New York partnership in which Paul Lazare and Andreas Gal are alleged to be the only partners. It is alleged that Paul Lazare is a former officer and Chairman of the Board of Laga, Ltd. Lazare is also alleged to be a former director and Chairman of the Executive Committee of Panex Industries, Inc. and is alleged to have held corporate offices in Duplan prior to 1981. Andreas Gal is a former officer and director of Laga, Ltd. and Panex Industries, Inc. Gal, it is admitted, was an officer of Duplan in 1975, but resigned that position during that year.

As noted earlier, the consolidated actions by Four Winds and PID / Harthmans against the original Defendants were commenced on or before July 7, 1989. On or about March 2, 1992, Plaintiffs amended their complaints to add, among other new party defendants, the LAGA Defendants. The documents on record submitted with the LAGA Defendants' motion to dismiss show that on Febru-

ary 15, 1988, EPA conducted an on-site reconnaissance of the Laga building site and found twenty-two 55-gallon drums behind the building.[13] See Final Draft, Preliminary Assessment LAGA Building/Virgin Islands Department of Education, St. Thomas, U.S. Virgin Islands, Part IV: Site Summary and Recommendations, EP000497, 508 (March 24, 1989) [hereinafter "Preliminary Assessment Report"]. The preliminary assessment report states that the LAGA building site "is given a medium priority for further action for the following reasons":

* Waste containment is poor as evidenced by perforated and corroding drums.

* Groundwater in the vicinity of the site is used for domestic purposes, and the water main from the desalination plant does not extend to the Tutu area.

* The potential exists for runoff from the site to reach the Mangrove Lagoon via Turpentine Run.

* The waste area is accessible, and there are homes 230 feet east and downhill of the drum area.

The March 22, 1990 Unilateral Order and the February 19, 1992 Consent Order issued by the EPA and submitted with Laga's motion to dismiss, however, do not refer to the Laga building site or to any further action taken by the EPA with respect to that site.

The LAGA Defendants in their motion to dismiss contend that the amended complaints filed on or about March 2, 1992, almost five years after the plaintiffs discovered the alleged contamination which is the basis of their complaints, "are time-barred against long dissolved entities and individuals acting only in their capacities as corporate officers or directors." Specifically, they argue that the plaintiffs' claims for relief are untimely under the applicable statute of limitations and are barred by the pertinent corporate dissolution statutes with respect to Duplan, Panex, Inc., and Laga,

---

[13] According to the preliminary Assessment Report: The drums were deposited in an uncontrolled manner, and most of them were in poor condition. Some of the drums were rusted, some were perforated, some were deposited on their sides, some were empty, at least one were [sic] full. Vegetation has grown around most of the drums, and a few were nearly completely overgrown. There were no discernible labels on the drums . . . . There are no containment structures surrounding the drums, and the DPNR indicated solvents were used by the textile processing facility that previously occupied the building.

Ltd. To the extent that they were former officers and/or directors of these corporations, the actions may not be maintained against Gal and Lazare. It is also argued that the complaints fail to state claims upon which relief may be granted as to Panex Industries, and Panex Co., and as to Gal and Lazare as officers, directors, or partners thereof.

A. *Timeliness of Colon Law Tort Claims*

First, as the court has determined in section II(A) of this opinion, the limitation period that governs Plaintiffs' common law tort claims is the Virgin Islands two-year statute of limitations, Virgin Islands Code Ann. tit. 5, § 31(5)(A). The court also found at section II(B)(1) that in this case the discovery rule applies to toll the accrual date of Plaintiffs' common law tort claims. The LAGA Defendants date Plaintiffs' knowledge of "the essential facts" giving rise to their common law claims for relief to July 1987. Plaintiffs' complaints allege that their injuries stem from the migration of contaminants and pollutants into the aquifer and into their wells. To state their causes of action, Plaintiffs argue that they were required to engage in extensive discovery so that they could identify with some certainty the possible source of the contaminants to the aquifer. Indeed, Plaintiffs point out that neither the DPNR nor the EPA were able to determine before Plaintiffs that the toxic chemicals left behind by the Laga Defendants were a source of the pollution to the Turpentine Run Aquifer.

The LAGA Defendants' assertion is that the Preliminary Assessment Report of the Laga site placed Plaintiffs on notice of their common law tort claims. At best, this evidence is inconclusive as to the Laga site's being a source of the contamination. Under the facts of this case, it cannot be said that the causes of action against the LAGA Defendants accrued even on this later date. The court finds that the LAGA Defendants have failed to carry their burden of establishing that the amended complaints were not filed within the applicable limitation period.

B. *Corporate Dissolution as Bar to Complaints*

The court will now address the second and third grounds of the LAGA Defendants' motion. Duplan, Panex, Inc., and Laga, Ltd., contend that under Fed. R. Civ. P. 17(b), which provides that "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized," they are no longer amen-

able to suit under Delaware and Virgin Islands corporations law, even though both statutes continue the existence of dissolved corporations for a term of three years. Since both Duplan and Laga were dissolved more than five years prior to the filing of the complaints, they no longer exist as entities capable of suing or being sued. Specifically, Duplan argues that as of April 14, 1988, it no longer existed as an entity that may sue or be sued. Laga, Ltd. argues that it was "otherwise dissolved" under Virgin Islands Corporations law and ceased to exist as a corporation in 1984.

Plaintiffs respond that the motion to dismiss should be denied because both the Delaware and Virgin Islands corporate dissolution statutes are preempted by CERCLA. Plaintiffs argue that because further discovery will show that Panex, Inc. and Panex Co. are successor corporations and/or successive possessors of land, the LAGA Defendants are potentially liable under CERCLA. Thus, Plaintiffs argue, to read the Delaware and Virgin Islands corporate survival statutes as barring their amended complaints would defeat the clear policy behind CERCLA, which "imposes liability for those responsible for the release of . . . hazardous substances '[n]otwithstanding any other provision or rule of law.'" 42 U.S.C. § 9607(a)(2)(B). Plaintiffs also argue that additional discovery is required to determine (1) whether both the dissolved corporations are "dead and buried", as the movants contend, or merely dormant; (2) whether successor or surviving corporation liability may be imposed against Panex Industries, Inc.; and (3) whether the causes of action were discharged in the bankruptcy proceedings.

In their opposition to the LAGA Defendants' motion to dismiss, the Texaco Defendants argue that movants' contention that certain corporate doctrines operate to bar Plaintiffs' complaint is not supported by admissible evidence. It is also argued that liability under CERCLA cannot be established without additional discovery, and that CERCLA, if applicable, would preempt the application of the state corporate doctrines upon which the LAGA Defendants rely. The responses in opposition to the LAGA Defendants' motion to dismiss filed by the Esso Defendants and Ramsay raise similar objections to the court's granting the LAGA Defendants' motion to dismiss.

A challenge to the legal existence of a party or the capacity of a party to sue and be sued is an affirmative defense. Fed. R. Civ. P. 9(a). In accordance with Rule 17(b), the court must apply Delaware

92

Corporations Law[14] to determine whether the defunct Duplan may be sued, and Virgin Islands Corporation law[15] to determine Laga, Ltd.'s capacity to be sued.

All parties in opposition argue that with respect to the CERCLA claim, the corporate dissolution statutes are preempted and do not operate to shield dissolved corporations from CERCLA liability. There is a split among the circuits as to whether CERCLA supersedes Rule 17(b) and preempts state dissolution statutes. The minority view is expressed in Levin Metals Corp. v. Parr-Richmond Terminal Co., 817 F.2d 1448 (9th Cir. 1987). In Levin Metal the court was concerned that a finding of federal preemption "would prevent courts from looking to state law to determine whether a dis-

---

[14] Section 278 of Delaware General Corporations Law provides:
All corporations, whether they expire by their own limitation or are *otherwise dissolved*, shall nevertheless be continued, for the term of *three years* from such expiration or dissolution or *for such longer period as the court of chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits*, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities, and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized. With respect to any action, suit or proceeding begun by or against the corporation within 3 years after the date of its expiration or dissolution the action shall not abate by reason of the dissolution of the corporation; the corporation shall, solely for the purpose of such action, suit or proceeding, be continued as a body corporate beyond the 3-year period and until any judgments, orders or decrees therein shall be fully executed, without necessity for any special direction to that effect by the court of Chancery.
8 Del. Code. Ann. Corp. § 278 (1983) (emphasis added).

[15] The Virgin Islands corporate dissolution statute, Virgin Islands Code Ann. tit. 13, § 285, which was modeled after the Delaware statute, provides as follows:
All corporations, whether they expire by their own limitations or are *otherwise dissolved*, shall nevertheless be continued, for the term of *three years* from such expiration or dissolution of bodies corporate, for the purpose of prosecuting and defending actions by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, and to divide their capital stock, but not for the purpose of continuing the business for which the corporation shall have been established. With respect to any action, suit or proceeding *begun by or against the corporation within three years after the date of its expiration or dissolution* the action shall not abate by reason of the dissolution of the corporation; the corporation shall, solely for the purpose of such action, suit or proceeding, be continued bodies corporate beyond the three year period and until any judgments, orders or decrees therein shall be fully executed.

solved corporation could be sued in any case involving a federal cause of action." Id. at 1451; see also Joslyn Mfg. Co. v. T.L. James & Co., Inc., 893 F.2d 80 (5th Cir. 1990), cert. denied, 111 S. Ct. 1017 (1991) (rejecting the argument that state corporations laws are preempted by CERCLA, imposing such liability would "dramatically alter traditional concepts of corporate law."). The LAGA Defendants rely principally on Levin Metals to support their position that CERCLA should not be construed as preempting state dissolution statutes so as to impose clean-up liability on long dissolved corporations.

The majority of courts addressing this issue hold that in order to effectuate CERCLA'S broad remedial purpose and Congress' intent, the phrase "[n]otwithstanding any other provision or rule of law" must be read as superseding Rule 17(b) and preempting state statutes that would frustrate CERCLA's purpose. See United States v. Sharon Steel Corp., 681 F. Supp. 1492 (D. Utah 1987); see also Columbia River Serv. Corp. v. Gilman, 751 F. Supp. 1448 (W.D. Wash. 1990) (acknowledging that the reasoning in Sharon Steel was correct, but bound by Ninth Circuit precedent in Levin Metal); Soo Line Railroad Co. v. B.J. Carney & Co., 797 F. Supp. 1472, 1481 (D. Minn. 1992) (CERCLA preempts state capacity statutes); Traverse Bay Area Int. Sch. Dist. v. Hitco. Inc., 762 F. Supp. 1298, 1301 (W.D. Mich. 1991) (agreeing with Sharon Steel approach to the issue of CERCLA preemption of state capacity statutes).

 This court's independent consideration of the policies underlying CERCLA, the Third Circuit's precedent in similar contexts, and other cases addressing the identical issue, lead this court to agree with the Sharon Steel court that state law does not control the imposition of liability under CERCLA and must be ignored when not in accord with the policies of CERCLA.

Courts have reasoned that the "notwithstanding language" supports their conclusion that "Congress clearly intended to hold responsible parties liable for clean up costs." Sharon Steel, 681 F. Supp. at 1498–99; see also United States v. Distler, 741 F. Supp. 643, 646 (W.D. Ky. 1990). In Sharon Steel, the court noted Congress' express "concern[ ] about abandoned sites —'those where no owner can be found or where the owner cannot afford the cost of clean up.'" Sharon Steel, 681 F. Supp. at 1495 (quoting H.R. Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 20 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6123). And though Congress created the "so-

called Superfund" to pay for the clean up of hazardous waste "[w]henever possible," CERCLA places "the ultimate financial burden of toxic waste cleanup on those responsible for creating the harmful conditions." Id. (citing Artesian Water Co. v. Government of New Castle County, 659 F. Supp. 1269, 1276 (D.Del. 1987)). Aside from the above, this court also finds it significant that corporate dissolution is not among the short list of defenses to liability under CERCLA set forth in 42 U.S.C. § 9607(b). This court joins with other courts which have held that CERCLA supersedes Rule 17(b) and preempts state capacity statutes. The court must now determine whether the corporations still exist for purposes of CERCLA liability.

This court believes that the reasoning of United States v. McDonald & Eide. Inc., 865 F.2d 73, 76 (3d Cir. 1989), applies by analogy and supports its conclusion that state capacity law is preempted and the determination of "corporate existence" for purposes of CERCLA liability must be made by reference to the provisions of CERCLA. Addressing the question of whether a dissolved corporation exists for purposes of federal income taxation, the Third Circuit Court of Appeals in McDonald held that "the core test of corporate existence for purposes of federal income taxation is always a matter of federal law." Id. Whether the corporation still has assets is a consideration in determining legal existence under federal taxation law and, by analogy, legal existence under CERCLA. See Traverse Bay, 762 F. Supp. at 1301 (citing Sharon Steel, 681 F. Supp. at 1495).

In addressing this question, the Sharon Steel court made a distinction between "dead" and "dead and buried" corporations. In Sharon Steel, though the corporation had been dissolved for some time, the corporate assets had not yet been distributed to the shareholders. The location and identification of some corporate assets were sufficiently discernible signs of life for the imposition of CERCLA liability.

The LAGA Defendants argue that the assets of LAGA Industries, Ltd., Duplan Corp., and Panex, Inc. have long been distributed and thus that these corporations are "dead and buried" within the meaning of Sharon Steel. Plaintiffs contest this assertion. Plaintiffs argue:

> First, as the court held in Traverse Bay, the completed distribution of assets and the extent of dissolution is not dispositive in

the court's determination of CERCLA liability. Second, all the LAGA Defendants before this court are personally related and intertwined. The stockholders of the dissolved corporation, in whose hands the distributed assets may lie are, parties to this action. 'Whether undistributed or in the hands of shareholders, a dissolved corporation's assets should still be available for the cost of a CERCLA clean-up.'

Four Winds' Opp'n to Laga Mot. to Dismiss at 28 (citing Note, Robbing the Corporate Grave: CERCLA Liability, Rule 17(b), and Post-Dissolution . . . Capacity To Be Sued, 17 B.C. Env. Aff. L. Rev. 855 (1990)). Four Winds contends that preliminary discovery indicates that the major shareholders of the defunct corporation are around and that the disseminated corporate assets may be identified and located. Therefore, Four Winds argues it must be allowed to conduct discovery to determine whether these assets may be reached for CERCLA clean-up costs.

■ CERCLA imposes liability upon any "person" who was an "owner or operator" of a facility at the time of disposal of any hazardous substance. Corporations and partnerships are included in the definition of "persons." As the court in Traverse Bay noted, "[a]lthough an existing corporation is clearly a 'person' under CERCLA, a non-existent corporation cannot be included within that definition." Traverse Bay, 762 F. Supp. at 1298. Thus, whether a dissolved corporation is a "person" for imposition of liability under CERCLA depends on whether its assets can be identified and located to give it some discernible sign of legal life. Plaintiffs are therefore entitled to discover whether Duplan, Laga, and Panex, Inc. hold no assets and are therefore "dead and buried" beyond resurrection.

### 1. *Effect of Bankruptcy Decree*

Alternatively, the LAGA Defendants argue that the CERCLA claims against Duplan and Laga, Ltd., its wholly-owned subsidiary, were discharged in bankruptcy as a result of any "pre-petition" releases of hazardous substances. The LAGA Defendants assume in this argument that because the toxic waste was produced during the manufacturing period, the release or threatened release of hazardous substances occurred prior to the filing of the bankruptcy petition. This important factual finding cannot be assumed. Here, the bankruptcy petition was filed in 1976; Duplan

was re-organized under Chapter XI of the United States Bankruptcy Code in 1979, and re-emerged as Panex Industries, Inc. in 1981. The LAGA Defendants are accused of storing and maintaining toxic waste from their manufacturing facility above the Turpentine Run Aquifer. It is beyond question that these claims would fall within the broad definition of "claims" under the Bankruptcy Code.[16] In the case upon which the LAGA Defendants rely for this argument, the court went to great lengths to explain that:

> [A] discharge in bankruptcy cannot properly rest on the mere existence of . . . hazardous waste. Where, however, there has been a pre-petition release or threatened release of hazardous waste, there does exist an event that would render any claims arising from that circumstance dischargeable pursuant to the broad definition of "claim" set forth by the bankruptcy code.

In Re Chateaugay Corp., 112 B.R. 513, 522 (S.D.N.Y. 1990), aff'd, 944 F.2d 997 (2d Cir. 1991). There is nothing in this record, thus far, on which to rest a finding of "pre-petition release or threatened release of hazardous waste." Such a determination would have to await further discovery. Unless, as the court in Chateaugay emphasized, "there has been a pre-petition triggering event, i.e., the release or threatened release of hazardous waste, the claim is [not] dischargeable." Id. at 552.

Moreover, this argument must be rejected under Third Circuit precedent established in Matter of Penn Central Transportation Co., 944 F.2d 164 (3d Cir. 1991). In a case with similar procedural facts, the Third Circuit Court of Appeals found that where reorganization under the Bankruptcy Code was "consummated and the injunction based upon any right, claim or interest . . . was entered," in 1978, before the enactment of CERCLA in 1980, "there was no statutory basis for liability to be asserted against the bankrupt entity." Id. at 167. Therefore, because "no claims arose" prior to consummation, and because no legal relation was created until the passage of CERCLA, the claims asserted under CERCLA were not "contingent claims." Id. at 168. The Third Circuit concluded that

---

[16] Under the Bankruptcy Code, "claim" is defined in section 101(4), in relevant part, as:
[A] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured . . . .

"the asserted claims under CERCLA did not constitute discharge-able claims within the meaning of the [Bankruptcy Code] and thus survive the discharge of the debtor." Id.

■ The facts regarding Duplan's bankruptcy discharge are so similar as to be indistinguishable. In this case, it is alleged that the bankruptcy reorganization plan was "consummated" in August 1979, when Duplan's bankruptcy trustee was authorized to sell the Laga, Ltd. site. The cause of action came into being in 1980 with the enactment of CERCLA. In 1981, Duplan emerged from bankruptcy under the name of Panex Industries, Inc. Under the Penn Central analysis, the claims under CERCLA are not discharged.

Further, the court need not speculate as to which entity, Duplan (the original debtor) or Panex, Inc. (the reorganized company), should bear the loss if liability is imposed ultimately. The Third Circuit Court of Appeals in Penn Central answered that question thus: "such liability would remain with the reorganized company"—in this case, Panex, Inc. Id. at 168.

Having concluded that state corporate dissolution statutes are not a bar to Four Winds' claims under CERCLA, and that these claims were not dischargeable or discharged in the bankruptcy proceeding, the LAGA Defendants' motion to dismiss the CERCLA claim as against Duplan and Panex, Inc. is denied.

C. *Dismissal of the Common Law Claims Against the LAGA Defendants*

It is true, as the LAGA Defendants point out in their reply brief, that the response failed directly to address the question of whether the common law claims against Duplan, Panex Industries, Laga, Gal and Lazare are barred by the applicable corporate dissolution statutes. The LAGA Defendants argue that Plaintiffs' failure to re-spond directly to this question is a concession that these claims against these Defendants should be dismissed.

As to these claims, state law is not preempted and would govern pursuant to Fed. R. Civ. P. 17(b). Applying section 278 of Delaware Corporations Law, it would appear that Duplan lacks capacity to sue and be sued. The facts as pled in the complaints and supported by evidence not excluded by the court disclose that Panex, Inc., which was dissolved voluntarily by corporate resolution on Sep-tember 24, 1984, with a certificate of dissolution having been issued on April 25, 1985, ceased to exist as an entity that may sue and be sued on or about April 14, 1988.

Applying section 278, in a suit by the United States against a defunct Delaware corporation, the Court of Claims ruled that "[u]nless an action or proceeding by or against the corporation is commenced either prior to or within three years of the date of dissolution, a dissolved corporation has no capacity to sue or be sued." BLH, Inc. v. United States, 2 Cl. Ct. 463, 31 Cont. Cas. Fed. (CCH) P 71, 106 (1983); accord Johnson v. Airplane, 404 F. Supp. 726, 734 (D. Md. 1975) (remarking that "[t]he three year restriction on the right to bring suits contained in § 278, while not a statute of limitations per se, nevertheless represents a public policy that all suits by or against dissolved corporations must be commenced within three years following dissolution.").

The BLH court noted that upon the expiration of three years after dissolution, "BLH was not a 'dormant' corporation, that under Delaware law could be revived; it was a dead corporation without legal existence." Id. at 468. That court explained further:

> Delaware has provided an orderly process for the fixing of a finite time at which a corporation is terminated. The legal capacity of a dissolved corporation is controlled by the statute. To allow the dissolved corporation or its creditors to extend the 3-year period would destroy the statutory scheme for finality of dissolution, and render a major part of the statute meaningless.

Id. at 469.

 In light of the above, this court must conclude that under Delaware law, the common law claims against Duplan, reincorporated as Panex, Industries, Inc., may not be maintained and must be dismissed.

To the extent, the complaints state claims against Lazare and Gal in their capacity as officers, directors, or stockholders of Duplan and Panex, Inc., these claims must also be dismissed under section 325(b) of the Delaware General Corporation Law. That section provides:

> No suit shall be brought against any officer, director, or stockholder for any debt of a corporation of which he is an officer, director, or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.

Del. Code. Ann. tit. 8, § 385 (1985). Since no suit may be maintained against the dissolved corporations, and thus no judgment will ob-

tain, the common law claims against Lazare and Gal individually in their capacities as officers and directors of Duplan and Panex, Inc. must also be dismissed.

Considering next the action against Laga Industries, as the parties in opposition argue, it is by no means clear from the allegations of the complaints or the submissions of the movants that Laga has been dissolved as to be "dead" and/or "dead and buried," so as to be without legal existence. Unlike Duplan and Panex, Inc., no certificate of dissolution was filed and none issued by the Office of the Lieutenant Governor of the Virgin Islands with respect to Laga Industries. Laga argues that it was "otherwise dissolved" because of its failure to pay corporate franchise taxes. It contends that its dissolution occurred pursuant to section 533(c) of the Virgin Islands Corporations Law, which states in relevant part:

> The Lieutenant Governor upon determination that any Corporation has neglected for a period of one year to pay its annual franchise tax shall—
>
> (1) if the delinquent corporation is a domestic corporation, make notification upon the records of his office that such corporation is dissolved and it shall thereupon be dissolved and the directors of such corporation shall hold title to the property of the corporation as trustees for its stockholders and creditors to be disposed of under appropriate court proceedings;

Virgin Islands Code Ann. tit. 13, § 533(c)(1) (1978). Laga points out that there is no Virgin Islands case on this issue, but cites as support for its conclusion United States v. McDonald & Eide. Inc., 670 F. Supp. 1226 (1987), aff'd, 865 F.2d 73 (3d Cir. 1989). In McDonald the defendant corporation had been dissolved by gubernatorial proclamation for failure to pay corporate franchise taxes pursuant to the Delaware Corporations law. The district court held, and was affirmed by the Third Circuit Court of Appeals, that dissolution by gubernatorial proclamation comes under the definition of "otherwise dissolved" as used in section 278 of the Delaware General Corporation Law. Laga argues that the case is persuasive authority because the, Virgin Islands corporation capacity statute, Virgin Islands Code Ann. tit. 13, § 285, was expanded specifically to be analogous to 8 Del. Code Ann. § 278, the Delaware capacity statute.

First, the court notes that with respect to Laga's last assertion, McDonald is of doubtful authority. The provision under which Laga contends it has been dissolved was derived from "a statute of

100

the then Territory of Alaska, [and thus] its interpretation is controlled by the views of the courts of the Territory of Alaska respecting the Alaskan statute at the time it was adopted in the Virgin Islands." Cirino v. Hess, 9 V.I. 518, (1973).

Second, respondents point out, and the court concurs, that McDonald is factually distinguishable. In that case there was actually a gubernatorial proclamation declaring the corporation dissolved for failure to pay its franchise taxes. Here, there is no evidence that notification upon the records of the Lieutenant Governor's office that Laga is dissolved occurred. This court has held that section 533(c)(1) is "not self executing with respect to dissolution and revocation, and affirmative steps must be taken by the [Lieutenant Governor] to revoke a corporation's authority to do business in the Virgin Islands." Mardenborough v. Government of the Virgin Islands, 235 F. Supp. 468, 470 (D.V.I. 1964). Respondents argue that Laga has failed to prove dissolution under Section 533, a pre-requisite to its defense that section 285 operates to bar the claims against it.

 Reference to other sections of Virgin Islands Corporation Law, specifically section 312(a) and section 312(f), mandate the construction of section 533 as not working an automatic dissolution of a corporation that is in default of its franchise taxes. Section 312 provides that "a corporation whose articles have become inoperative by law . . . may at any time procure an extension, restoration, or revival of its articles of incorporation." Thus, section 312 makes clear, respondents argue, that a corporation's non-payment of taxes is a forfeiture of its charter and not a dissolution of the corporation. Laga, respondents argue, like the holding company in Wax v. Riverview Cemetery Co., 24 A.2d 431 (Del. Sup. Ct. 1942) which had not paid franchise taxes for nine years, has merely forfeited its right to do business in the Virgin Islands, and is not dissolved so that it may not be sued. The Delaware Supreme Court, in holding that the defunct corporation could be sued in a foreclosure action on real estate it had once held title to and had given a mortgage, declared that the corporation was "not completely dead, but in a state of coma from which it can be easily resuscitated." Id. at 436. Because Laga Industries, Ltd., has failed to convince this court that Plaintiffs cannot prove any set of facts that would entitle it to relief, its motion to dismiss will be denied.

D. *Liability of Panex Co., Lazare, and Gal.*

In the motion to dismiss, it is contended that the CERCLA claims asserted against Panex Industries, Inc., Panex Co., Lazare, and Gal as the only partners of Panex Co., must fail because these entities and individuals do not come within the statutory definition of "covered persons," who shall be liable under the statute. The LAGA Defendants argue that under 42 U.S.C. § 9607(a), Panex, Inc., Panex Co., Lazare, and Gal do not fall within the classes of "covered persons" because they are not "persons who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed." These LAGA Defendants argue that by Four Winds' own allegations, all operations of the textiles plant on the Laga site ended in 1979, before Panex Co. purchased the Laga site and before the incorporation of Panex Industries, Inc. Therefore, they conclude, by definition neither Panex Co. nor Panex, Inc. owned the Laga site "at the time of disposal" and Four Winds' CERCLA claims must be dismissed.

These LAGA Defendants' interpretation of the CERCLA provisions imposing liability is fallacious. Among those statutorily defined as "covered persons" are current or past "owners" or "operators" who "owned or operated" the *facility* at the time of *disposal* of the hazardous substance." Id. § 9607(a)(2).

Under the statute, "facility is defined to include: (A) any building, structure, installation . . . landfill, storage container . . . or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, placed, or otherwise come to be located." 42 U.S.C. § 9601(9). The statute defines "release" to mean "any spilling, leaking, pumping, pouring, emitting, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." 42 U.S.C. § 9601(22). The textile plant need not be "operating," as these LAGA Defendants contend, for there to be liability under CERCLA. Here, Defendants do not dispute that they were or are "owners" of a site where Duplan and Laga, the previous owners of the Laga Building Site, stored and maintained drums allegedly containing hazardous substances. These LAGA Defendants do not deny that neither they nor their closely linked predecessors did nothing to remove the hazardous waste openly stored on the site. As the above definitions make clear, if during

102

their ownership and/or control of the Laga Building and site, hazardous substances "deposited" or "stored" or "located" at the site "leaked" or "escaped" or "leached" into the environment, then Panex, Inc. and Panex Co. are "covered persons" under the statute. To accept these Defendants' argument would be to permit 'owners' to avoid liability by simply selling off sites after the cessation of operation, which may include dumping, to new owners who would not then be liable under the Act.

Indeed, one court looking at the statutory definition of "disposal" rejected the argument that the Act "requir[es] proof of affirmative participation in hazardous waste disposal as a prerequisite to liability." Nurad. Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 840 (4th Cir. 1992). CERCLA, at 42 U.S.C. § 9601(29), specifically incorporates by reference the following broad definition of "disposal" stated in the RCRA as its definition of "disposal":

> The term "disposal" means the discharge, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). Interpreting this term, and the term "release" as defined above, the Nurad court explained that the words as defined in the statute have both an active element, as in the use of "deposit," "injection," "dumping," and "placing," and a passive element, as in the use of "leaking" and "spilling." See Nurad, 966 F.2d at 845.

The court's determination that Panex, Inc. and Panex Co. are "covered persons" within the meaning of CERCLA, is not without other support. In State of New York v. Shore Realty Corp., 759 F.2d 1032, 1045 (2d Cir. 1985), a current owner of property was held liable for clean-up costs under CERCLA for leaching and seepage of hazardous substances from drums and pipelines on property. The court noted that the legislative history of CERCLA supports an "imposit[ion] of liability on classes of persons without reference to whether they caused or contributed to the release or threat of release." Id., 759 F.2d at 1044 (citing 126 Cong. Rec. 31, 981–82, H.R. 7020, 96 Cong., 2d Sess. (1980)).

103

The question of whether "releases" occurred during the relevant times of ownership cannot be determined on this record. The evidence so far indicates that at the time of "ownership," there was at the very least a threat of release and that contamination of the aquifer was gradual, continuing over a period of time. Whether these LAGA Defendants can overcome the presumption that they were "owners" at the time of release would require additional discovery.

In conclusion, the court notes that at section VIII(B) of this opinion, the court indicated that under Third Circuit precedent, Panex, Inc., would be liable for any releases of hazardous substances attributable to Duplan. It is clear that Panex Industries, Inc. has direct liability as an "owner" at the time of release. With respect to Panex Co., a New York partnership (of which Lazare and Gal are the only partners), it is the record owner of the Laga, Ltd. building as of December 12, 1979, and it is potentially liable under CERCLA. As the general partners of Panex Co., Lazare and Gal may be held jointly and severally liable, as liability attaches through Panex Co. ownership of the Laga, Ltd. Building Site. Accordingly, the court will deny the motion to dismiss the CERCLA claim as against Panex, Inc., Panex Co., Lazare, and Gal.

## IX. CONCLUSION

For the reasons stated above the court finds as follows:

1. That the common law claims for nuisance, negligence, and strict liability are controlled by the two-year limitation period, Virgin Islands Code Ann. tit. 5, § 31(5)(A), which governs torts generally.

2. That the discovery rule applies, and the claims for strict liability and/or nuisance and negligence, as stated in PID/Harthmans' Fourth Amended Complaint and Four Winds' First and Second Amended Complaints against Exxon, ESSORICO, and the LAGA Defendants are not time-barred.

3. That the relation-back doctrine applies to Four Winds' Complaint so that the action against ESSORICO is timely.

4. That the complaints may be maintained against Exxon and are not insufficient on their face.

5. That the rule of strict liability applies to the facts of the case.

6. That Exxon is potentially liable as an "operator" under CERCLA.

7. That Exxon's motion for clarification of the Magistrate Judge's Order of March 17, 1992 is mooted by the court's determinations in this opinion.

8. That no private right of action for indemnification and damages will be implied under the Virgin Islands Solid and Hazardous Waste Management Act, Virgin Islands Code Ann. tit. 19, §§ 1551–1564, and that Four Winds' claims against the defendants under the Act are therefore dismissed.

9. That the corporate dissolution doctrine does not operate to bar the claims under CERCLA against the LAGA Defendants.

10. That the Common Law claims against Duplan and Panex, Inc. are dismissed.

11. That the motion to dismiss the common law claims against Laga Industries, Ltd. is denied because Laga, Ltd. has not shown that it is a dissolved corporation under the laws of the Virgin Islands.

12. That the CERCLA claim against Duplan and Panex, Inc. was not discharged in bankruptcy.

13. That Panex, Co., Lazare and Gal are potentially liable under CERCLA.

An appropriate order will be entered.

IT APPEARING that the opinion and order on motion for summary judgment entered by this court on August 13, 1993 was amended by subsequent order dated/filed September 2, 1993; and

IT FURTHER APPEARING that considering the length of the opinion it would be more convenient and efficient to redraft the original opinion and order of August 13, 1993 to reflect the corrections set forth in the amended order so that they are all contained in one document;

IT IS on this 24th day of March, 1994, hereby

ORDERED that the original opinion and order dated August 13, 1993 is hereby revised to incorporate the corrections set forth in the amended order dated/filed September 2, 1993, with the revised opinion and order to be dated September 2, 1993, the date/filed date of the last amended order.

SO ORDERED.